PRESENT: All the Justices

D.R. HORTON, INC.

OPINION BY
v. Record No. 120384              JUSTICE ELIZABETH A. McCLANAHAN
                                  FEBRUARY 28, 2013
BOARD OF SUPERVISORS FOR THE
COUNTY OF WARREN

FROM THE CIRCUIT COURT OF WARREN COUNTY
William H. Ledbetter, Jr., Judge Designate

D.R. Horton, Inc. (Horton) challenges the trial court's ruling that certain building permit fees it paid to Warren County, which were later found to be unlawful, were nonetheless paid "voluntarily" under the common law voluntary payment doctrine, thus defeating Horton's claim for their return. We will affirm the judgment of the trial court.

BACKGROUND

At the request of Blue Ridge Shadows, LLC (BRS) (Horton's predecessor in title), the Board of Supervisors for Warren County (the Board) rezoned a tract of land owned by BRS near the Town of Front Royal from agricultural to suburban residential. As part of the rezoning process, BRS made a number of written "proffers" to the Board as inducements for the right to develop the property as a subdivision containing up to 225 residential units. The Board ultimately accepted BRS's "Revised Rezoning Request Proffer," (the revised proffer), in conjunction with approving BRS's rezoning application. In the revised proffer BRS proposed, among other things, to construct and operate a centrally located wastewater

treatment plant and water system to service the residential units within the development. BRS also proposed to "make cash payments in the total amount of $8,000.00 per residential unit" payable each time Warren County (the County) issued a building permit for one of the units.[1]

Afterwards, in a "confidential" letter to the County attorney, BRS proposed: (i) that the Board allow BRS to obtain water and sewer services for the development from the Town of Front Royal in lieu of BRS constructing the proposed water and sewer systems; and (ii) that, in exchange, BRS would pay to the County an additional "hook-up fee" in the amount of $4,000 for "each residential water/sewer hookup obtained" from the Town. The parties never executed an agreement regarding this proposal. The Board, however, voted to allow the development to connect to the Town's water and sewer systems. The Board also voted to amend BRS's revised proffer to the County by deleting BRS's obligation to construct such systems for the development.

Horton, a real estate developer, subsequently purchased from BRS most of the property contained within the proposed development and identified as the "Blue Ridge Shadows Subdivision" (the subdivision). Horton purchased the subdivision subject to BRS's

---

[1] These proffered payments were offered to "offset the fiscal impacts" of the proposed development on the County's capital facilities, as authorized by Code § 15.2-2296.

revised proffer, as amended by the deleted obligation to construct the water and sewer systems.

The County issued to Horton a total of 52 building permits between May 2006 and January 2010. For each permit, Horton paid to the County a "proffer fee" of $12,000, amounting to $4,000 more than the $8,000 fee set forth in the revised proffer.

Horton learned in early 2006 when applying for the first building permits that the County would be charging the additional $4,000 per permit as the "hook-up" fee BRS previously proposed to the County in lieu of constructing the water and sewer systems. After investigating the matter, Horton stated its objections to paying this fee during a series of meetings between Horton's representatives and County officials. Horton's counsel also sent a letter to the County later that year stating that Horton did not believe it was obligated to pay the fee pursuant to the terms of the revised proffer; that it would pay the fee "until this matter has been resolved" in order "to avoid further damage to [Horton]"; and that it was paying the fee "only under protest and with a full reservation of its rights and remedies."

In 2007 Horton filed a declaratory judgment action asking the trial court to declare that the County could not lawfully assess the $4,000 fee against it. The court agreed with Horton and entered a

final order in 2011 (after the fee had been paid on all 52 permits) holding that Horton was not obligated to pay the fee.[2]

In 2008 Horton instituted the instant restitution action seeking reimbursement of the fees by filing a complaint against the Board in the form of an appeal to the circuit court, pursuant to Code § 15.2-1246.[3]  In the appeal, Horton challenged the Board's denial of its claim for $104,000 based on its payment of the $4,000 fee on each of its first 26 building permits.[4]  The Board raised the voluntary payment doctrine as an affirmative defense.  The trial court consolidated this restitution action and Horton's declaratory judgment action for a bench trial.  After ruling in Horton's favor in the declaratory judgment action, the court held in this action that Horton was nevertheless barred from being awarded reimbursement of the unlawful fees because it paid them "voluntarily" within the meaning of the voluntary payment doctrine.

This appeal followed.

---

[2] The trial court's decision was based on its finding that "there was never an agreement finalized that was . . . intended to be binding [between] the [C]ounty [and BRS] with respect to this [fee]."  Therefore, the court concluded, the fee could not lawfully be assessed against Horton.

[3] Code § 15.2-1246 establishes the procedure by which a party may challenge by an appeal to a circuit court the "disallowance" of a monetary claim by the decision of a county's governing body.

[4] Although the record does not show that Horton amended its complaint in this case, both Horton and the Board indicate in their respective appellate briefs that the amount in dispute is $208,000 based on Horton's payment of the $4,000 fee on all 52 building permits issued for the subdivision between May 2006 and January 2010.

ANALYSIS

Horton argues on appeal that it paid the unlawful building permit fees involuntarily. The trial court erred, Horton contends, in denying its claim for reimbursement of the fees upon a misapplication of the voluntary payment doctrine and rejecting its argument on equitable grounds.

Well-settled principles govern our review of the trial court's decision. We will not disturb the trial court's findings of fact unless they are plainly wrong or without evidence to support them, but we will review de novo its conclusions of law. City of Richmond v. SunTrust Bank, 283 Va. 439, 442, 722 S.E.2d 268, 270 (2012).

The voluntary payment doctrine, as established under Virginia common law, provides as follows:

> "Where a party pays an illegal demand with a full knowledge of all the facts which render such demand illegal, [i] without an immediate and urgent necessity therefor, or [ii] unless to release his person or property from detention, or [iii] to prevent an immediate seizure of his person or property, such payment must be deemed voluntary, and cannot be recovered back. And the fact that the party at the time of making the payment, files a written protest, does not make the payment involuntary."

Barrow v. County of Prince Edward, 121 Va. 1, 2-3, 92 S.E. 910, 910 (1917) (quoting Lamborn v. County Commissioners, 97 U.S. 181, 187 (1878)). Furthermore, in the context of this doctrine, we have held that "[a]ll payments are presumed to be voluntary until the contrary is made to appear." Town of Phoebus v. Manhattan Social Club, 105

5

Va. 144, 149, 52 S.E. 839, 840 (1906).  Therefore, the plaintiff has the burden "to show that its payment was not voluntary."  Id.

This doctrine has been strictly applied in Virginia for more than a century and a half.  See Mayor of Richmond v. Judah, 32 Va. (5 Leigh) 305, 315-321 (1834); Williams v. Consolvo, 237 Va. 608, 613, 379 S.E.2d 333, 336 (1989).  During that time when the doctrine has been implicated, this Court has held in "decidedly few" cases that payment of an unlawful demand was, in fact, involuntarily paid.  Id. at 614, 379 S.E.2d at 336; see, e.g., Vick v. Siegel, 191 Va. 731, 734-36, 62 S.E.2d 899, 900-01 (1951) (landowner's payment of trustee's unlawful demand to avoid losing sale of property was involuntary).  The Court has acknowledged that the doctrine may appear to be somewhat "harsh."  Town of Phoebus, 105 Va. at 149, 52 S.E. at 840.[5]  Early on, however, the Court explained the significance of the doctrine in advancing certainty and finality between parties in the resolution of their legal affairs; and aptly noted that, without it, "the payment of money would soon become but the parent of a suit, and the settlement of an account the harbinger of litigation."  Judah, 32 Va. (5 Leigh) at 322 (Tucker, J., concurring).

---

[5] See also Judah, 32 Va. (5 Leigh) at 319 (explaining that the doctrine "may sometimes, indeed, operate hardly . . . but not more so than the statute of limitations, or many other principles of the law, which have been adopted with a view to general policy").

Horton makes four alternative arguments for why its payment of the subject fees was involuntary so as to negate the County's voluntary payment defense. First, Horton argues that it paid the fees involuntarily because the County's refusal to issue the building permits without payment of the fees constituted a seizure of a property right consisting of Horton's right to develop the subdivision. We agree with Horton that "[d]evelopment rights are property rights" protected under Virginia law. Bentley Funding Group, L.L.C. v. SK&R Group, L.L.C., 269 Va. 315, 331, 609 S.E.2d 49, 57 (2005). We reject Horton's contention, however, that a seizure of such a right was effected by the County's unlawful demand for fee payments as Horton did not in any way "los[e] the right to develop its property" as a result of that demand; and indeed proceeded with development. City of Virginia Beach v. Bell, 255 Va. 395, 403, 498 S.E.2d 414, 419 (1998) (emphasis and internal quotation marks omitted) (inverse condemnation case).[6]

Next, Horton asserts that it paid the fees involuntarily because it "face[d] other proceedings or actions if [it] refused to pay the fee and build without a building permit or refused to build." Specifically, Horton claims it faced criminal charges if it proceeded without obtaining the permits from the County, or, alternatively, it faced breach of contract actions by third parties

---

[6] Accordingly, Horton's reliance on condemnation cases such as Bell to advance the argument that the County seized its property is misplaced.

if it refused to go forward with its residential construction to avoid paying the fees. We see no evidence in the record, however, that the County was threatening Horton with any criminal action or that Horton had executed any contract with a third party for construction of a residence in the subdivision. Furthermore, neither circumstance could be considered under the voluntary payment doctrine as a basis for establishing an involuntary payment without Horton showing as a threshold matter that there was an "immediate and urgent necessity" for paying the County's unlawful demand, as we address in response to Horton's next argument. Barrow, 121 Va. at 2, 92 S.E. at 910.

For its third argument, Horton asserts that an immediate and urgent need to pay the fees rendered its payments involuntary. Such a need existed, Horton contends, because it "faced an immediate and urgent necessity" to "do what it could to build and sell houses," which included paying the fees to obtain the permits authorizing their construction. To establish the requisite necessity to pay an unlawful demand, a plaintiff must prove that it "did not have time and opportunity to relieve [itself] of [its] predicament by resorting to legal methods." Vick, 191 Va. at 735-36, 62 S.E.2d at 901. Thus, Horton had to show that it had no time or opportunity before paying the County's unlawful demand to at least seek an appropriate legal remedy. Horton failed to do so. Horton acquired the permits on which it paid the fees over a period of three and a

8

half years.  For that period, Horton did not establish any reason why it could not have sought injunctive relief before acquiring any one of the permits.  See Williams, 237 Va. at 615, 379 S.E.2d at 337 (plaintiff could have secured injunction before paying unlawful demand).  Instead, Horton paid the fees to the County on its own both before and after filing the declaratory judgment action and the instant restitution action; and it continued doing so for the three and a half years until it had paid all of the fees to the County.

Horton's fourth argument for why its fee payments were involuntary is that it adequately protested the assessment of the fees through its representatives' meetings with County officials, its protest letter to the County and ultimately its filing of the declaratory judgment action.  This argument is without merit because simply protesting an unlawful demand does not render payment of the demand involuntary under the voluntary payment doctrine, as explained above in Barrow.  See also Town of Phoebus, 105 Va. at 149, 52 S.E. at 840 ("The mere declaration of the plaintiff when it made payment, that it was made under 'protest' does not show that it was not voluntarily made.").

Finally, Horton argues that the trial court erred in rejecting its assertion that the County's retention of the fees unjustly enriched the County and was inherently inequitable.  Those claims constitute the basis for a restitution action, which is the nature of Horton's instant action seeking reimbursement of the fees.

9

However, the voluntary payment doctrine provided the County a valid defense to this action.  See Skyland Metro. Dist. v. Mountain West Enter., LLC, 184 P.3d 106, 127 (Colo. App. 2007) ("The [voluntary payment] rule is a defense to claims asserting unjust enrichment." (citation omitted)).

## CONCLUSION

For the reasons stated above, we conclude the trial court did not err in holding that Horton's action for reimbursement of the disputed fees was barred under the voluntary payment doctrine.  We will therefore affirm the judgment of the trial court.

Affirmed.