PRESENT: All the Justices

BENTLEY FUNDING GROUP, L.L.C., ET AL.

OPINION BY
v. Record No. 041386    JUSTICE G. STEVEN AGEE
March 3, 2005
SK&R GROUP, L.L.C.


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Richard B. Potter, Judge

Bentley Funding Group, L.L.C. ("Bentley") and Peter Denger appeal from a judgment of the Circuit Court of Prince William County in favor of SK&R Group, L.L.C. ("SK&R"). The judgment awarded SK&R the balance of certain erosion control escrow accounts ("the Escrows") posted with Prince William County, Virginia ("the County") on behalf of Bentley. For the reasons set forth below, we will reverse the judgment of the trial court.

I. BACKGROUND AND PRIOR PROCEEDINGS

Bentley acquired approximately 164 acres located in the County, which it undertook to develop as River Oaks. In March 1998, as a part of its efforts to develop River Oaks, Bentley entered into five Siltation and Erosion Control Agreements with the County ("the Agreements"). As required by the Agreements, Bentley caused cash Escrows to be posted with the County on March 16, 1998, in order to secure the performance of Bentley's obligations under the Agreements. Over the course of time, the County withdrew some amounts from the Escrows to perform erosion

control work at River Oaks, leaving a balance of $349,334.82 in January 2001.

Denger, who owns a one-third membership interest in Bentley, provided the entire escrow amount from his personal funds to a trust account of Bentley's attorneys who transferred the funds to the County. Bentley and Denger had an unwritten agreement that the Escrows would be returned to Denger when released by the County.

On August 11, 2000, an involuntary Chapter 11 bankruptcy petition was filed in the United States Bankruptcy Court for the Eastern District of Virginia against Bentley. An order for relief was entered, but no trustee was appointed so the bankruptcy proceeded with Bentley as debtor in possession. As required by bankruptcy law, Bentley and its members filed various disclosures and schedules under penalty of perjury. The Escrows were not listed on any schedule as an asset of Bentley's bankruptcy estate. SK&R was a secured creditor of Bentley with a recorded deed of trust secured by the River Oaks real property.

On January 9, 2001, while Bentley's bankruptcy proceeding was pending, Bentley and SK&R entered into a contract whereby Bentley would transfer all of the River Oaks real property to SK&R ("the Contract") except for a 23 acre parcel zoned for

commercial use.  The Contract, which required the approval of the Bankruptcy Court, states in relevant part:

> RECITALS
>
> Seller is owner of that certain real property . . . consisting of approximately 164 acres of land . . . and all improvements thereon and appurtenances thereunto belonging, . . . (the "Prince William Property").  The Prince William Property, . . . consists of Parts 1 through 6. . . . Seller has agreed to sell to Purchaser all its right, title and interest in and to Parts 1, 3, 4, 5 and 6 of the Prince William Property . . . .
>
> CONTRACT
>
> 1. Property. . . . Seller hereby agrees to sell and Purchaser agrees to purchase Parts 1, 3, 4, 5 and 6 of the Prince William Property . . . together with all improvements thereon and appurtenances thereunto belonging and together with all approvals, permits, development rights, all consents and renewals thereof relating thereto (the "Property") in accordance with the provisions and on the terms and conditions hereinafter set forth.
>
> . . . .
>
> 5. Settlement. (a) Possession of the Property shall be given to Purchaser by Seller at settlement. . . . Purchaser and Seller agree to execute such other documents at settlement as may be reasonably necessary or advisable to consummate the transaction contemplated hereby. At settlement, Seller shall also convey and assign to Purchaser all of Seller's interest in and to any and all warranties relating to the Property.

There is no mention of the Agreements or the Escrows in the Contract.  Denger, in his individual capacity, was not a party to the Contract.

3

On January 30, 2001, the Bankruptcy Court entered an Order approving the Contract, which contained the following finding by the Court:

> E.  The terms of the Contract provide that [Bentley] will convey to SK&R or its designee approximately 141 acres of the River Oaks Property (such 141 acres, the "Property"), free and clear of all liens, interests, and encumbrances, it being the intent of the parties that SK&R receive title to all of [Bentley's] interest in the River Oaks Property except the nearly 23 acres that is zoned "B-1" for commercial use, all as more particularly described in the Contract;

At closing on February 9, 2001, Bentley delivered and SK&R accepted a General Warranty Deed ("the Deed") conveying to SK&R 140.7543 acres of River Oaks Property, "together with all improvements thereon and appurtenant rights thereunto belonging."  The Deed contains no mention or reference to the Escrows.  No assignment or other instrument was ever executed whereby Bentley or Denger assigned, transferred or otherwise conveyed the Escrows to SK&R.  No assignment or similar instrument transferring the Escrows was requested by SK&R at settlement, or at any time thereafter.

On March 26, 2002, the County issued a check to Bentley in the amount of $21,164.57, refunding a portion of the Escrows. On April 4, 2002, SK&R notified the County that it claimed the Escrows.  The County then filed an interpleader action to

4

determine ownership of the Escrows naming Bentley and SK&R as defendants.[1]

SK&R claimed ownership of the Escrows under the Contract as part of "all improvements thereon and appurtenances thereunto belonging and together with all approvals, permits, development rights, consents and renewals thereof relating thereto."  SK&R also claimed the Escrows under the language of the Bankruptcy Court Order confirming the Contract which recited: "it [was] the intent of the parties that SK&R receive title to all [Bentley's] interest in the River Oaks Property."

Bentley and Denger denied SK&R had any interest in the Escrows.  Bentley contended that the Escrows had been posted for the benefit of Bentley with funds belonging to Denger and that the Escrows should be paid to Denger or alternatively, released to Bentley.  Similarly, Denger contended that he provided the funds for the Escrows, and they should be paid to him or alternatively, to Bentley.

While the interpleader action was pending in the trial court, SK&R filed a motion in the Bankruptcy Court to reopen Bentley's bankruptcy proceeding which had been closed after payment in full to all creditors.  SK&R asked the Bankruptcy Court to clarify its Order confirming the Contract as to whether

---

[1] The trial court later entered an agreed Order granting Bentley leave to file an amended answer and joining Denger as a party defendant.

the Escrows were conveyed by the Contract.  The Bankruptcy Court denied the motion.

Upon conclusion of a bench trial, the trial court ruled that SK&R owned the Escrows in its order of March 12, 2004 ("March 12th order"), which also incorporated the transcript of the bench ruling.[2]  The trial court found, "it was the intent of the parties to transfer the entire project from Bentley Funding Group, L.L.C., to SK&R Group, L.L.C., including the erosion control escrows and agreements," and that the Escrows constituted a "development right" under the Contract.  Accordingly, as all development rights were conveyed to SK&R under the Contract, SK&R owned the Escrows.  Further, the trial court found that because Bentley never claimed the Escrows as an asset in the bankruptcy proceeding, Bentley could not now assert a claim.  "The [Escrows] were not listed by [Bentley] as an asset in the bankruptcy proceedings and therefore, [Bentley] cannot now claim it as an asset."

The trial court also found "there is no evidence to support the allegation that Mr. Denger owned the escrows."  The trial court opined that in as much as the Escrows were part of the development rights conveyed to SK&R, and that the conveyance as

_____

[2] The trial court previously entered a decree acknowledging that the County had deposited with the clerk of the trial court the sum of $328,170.25, representing the entire balance of the Escrows and dismissing the County as a party.

approved must be free and clear of all liens . . . and it was specifically not the intention of the parties in entering into the Contract that any party, including Mr. Denger, was to have an interest in any portion of the assets which were to be conveyed in the Contract.

We awarded Bentley and Denger this appeal.

## II.   STANDARD OF REVIEW

Bentley and Denger assign error to the trial court's ruling in the nature of claim preclusion by judicial estoppel.  While this Court has not had occasion to set out a standard of review for the application of judicial estoppel, the United States Court of Appeals for the Fourth Circuit, along with the majority of jurisdictions,[3] reviews a trial court's application of judicial estoppel for an abuse of discretion.  Jaffee v. Accredited Surety and Cas. Co., Inc., 294 F.3d 584, 595, n.7 (4th Cir. 2002).  Because judicial estoppel is an equitable doctrine, "invoked in the discretion of the [trial] court," King

---

[3]  See Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 30-31 (1st Cir. 2004); Cheng v. K&S Diversified Invs., Inc. (In re Cheng), 308 B.R. 448, 452 (B.A.P. 9th Cir. 2004); Hall v. GE Plastic Pacific PTE Ltd., 327 F.3d 391, 396 (5th Cir. 2003); De Leon v. Comcar Indus., 321 F.3d 1289, 1291 (11th Cir. 2003); Klein v. Stahl GMBH & Co., 185 F.3d 98, 108 (3d Cir. 1999); Okland Oil Co. v. Conoco Inc., 144 F.3d 1308, 1325 (10th Cir. 1998);  Sword v. Sweet, 92 P.3d 492, 502 (Idaho 2004); Barack Ferrazzano Kirschbaum Perlman & Nagelberg v. Loffredi, 795 N.E.2d 779, 784 (Ill. App. Ct. 2003); L.D.H. v. K.A.H., 665 N.E.2d 43, 46-47 (Ind. Ct. App. 1996); Whitacre P'ship v. Biosignia, Inc., 591 S.E.2d 870, 894 (N.C. 2004).

v. Herbert J. Thomas Mem. Hosp., 159 F.3d 192, 196 (4th Cir. 1998), we will also apply an abuse of discretion standard.

The parties agree that the Contract is not ambiguous, and the trial court so found: "I don't find this as [sic] ambiguous."

> When the terms of the parties' documents are clear and unambiguous the interpretation of those terms presents a question of law. . . . Thus, on appeal, we are not bound by the trial court's resolution of these questions of law, and we are afforded the same opportunity as the trial court to consider the terms of the documents at issue.

Musselman, L.L.C. v. The Glass Works, 260 Va. 342, 346, 533 S.E.2d 919, 921 (2000) (citations omitted). Therefore, we will review and interpret the provisions of the Contract without any deference to the trial court's conclusions.

### III. ANALYSIS

Bentley and Denger make seven assignments of error to the trial court's judgment which may be consolidated to the following more concise issues:[4]

(1) The trial court erred in finding that Bentley's failure to list the Escrows as an asset of its bankruptcy estate precludes assertion of a claim of ownership in the instant proceeding.

(2) The trial court erred in not construing the Contract in conformity with its plain meaning or in accordance with the rule of expressio unius est exclusio alterius.

---

[4] On brief to this Court, Bentley and Denger list an eighth assignment of error, which they concede was not granted by this Court and will therefore not be considered. See Rule 5:17(c).

8

(3)  The trial erred in finding that the Escrows were a "development right."

(4)  The trial court erred in finding that the post-contractual conduct of Bentley, specifically Bentley's failure to list the Escrows as assets in bankruptcy, was dispositive of the parties' intent under the Contract.

(5)  The trial court erred in finding there was no evidence Denger owned the Escrows.

The trial court's March 12th order awarding the Escrows to SK&R is based, in part, upon two specific findings:

It would be a sham on the Bankruptcy Court for this Court to find that the erosion control escrows were an asset of Bentley Funding Group, L.L.C.[Finding No. 6]; and

. . . .

The erosion control escrows were not listed by Bentley Funding Group, L.L.C., as an asset in the bankruptcy proceedings and therefore Bentley Funding Group, L.L.C., cannot now claim it as an asset.  [Finding No. 8]

Although not termed as such, the trial court effectively ruled that Bentley is barred from making a claim to the Escrows under the doctrine of judicial estoppel.  We will therefore first examine the trial court's judgment on this issue because it is dispositive as to Bentley if the trial court is correct. There is, however, no judgment by the trial court applying

judicial estoppel as to Denger so his claim to the Escrows is unaffected by the resolution of this issue.[5]

A.   Claim Preclusion by Judicial Estoppel

"[J]udicial estoppel forbids parties from assuming successive positions in the course of a suit, or series of suits, in reference to the same fact or state of facts, which are inconsistent with each other, or mutually contradictory." Lofton Ridge, LLC v. Norfolk S. Ry. Co., 268 Va. 377, 380-81, 601 S.E.2d 648, 650 (2004) (citations and internal quotation marks omitted). While the concept of judicial estoppel seems clear enough, application of the doctrine has not proven susceptible to precise definition. "The circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." Allen v. Zurich Ins. Co., 667 F.2d 1162, 1166 (4th Cir. 1982).

In New Hampshire v. Maine, 532 U.S. 742 (2001), the United States Supreme Court recognized the inherent malleability of the doctrine of judicial estoppel. "[W]e do not establish

---

[5] SK&R offered evidence in the trial court that Denger answered interrogatories in a New Jersey proceeding wherein he failed to list the Escrows as a personal asset. However, SK&R was not a party to the New Jersey proceeding. As more thoroughly discussed below, in Lofton Ridge, LLC, v. Norfolk S. Ry. Co., 268 Va. 377, 383, 601 S.E. 2d 648, 651 (2004), we noted "the doctrine of judicial estoppel will not act as a preclusive bar to the subsequent proceeding unless the parties are the same." Furthermore, the trial court in the case at bar never addressed judicial estoppel as to Denger and SK&R did not assign cross error in that regard.

inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." Id. at 751. Although we have not previously set out a specific listing of all the necessary elements of judicial estoppel, certain factors must be present in order for the doctrine to apply.

The fundamental element of judicial estoppel is that "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in a prior litigation. And the position sought to be estopped must be one of fact rather than law or legal theory." Lowery v. Stovall, 92 F.3d 219, 224 (4th Cir. 1996) (citation omitted). Accord Lofton Ridge, 268 Va. at 382, 601 S.E.2d at 651.

To the extent Bentley lays claim to the Escrows in the case at bar, its position is one of fact and is clearly inconsistent with its failure to claim the Escrows in the prior bankruptcy proceeding. The initial element of judicial estoppel is thus satisfied because the party sought to be estopped (Bentley) has adopted a position in the current litigation (that it owns the Escrows) that is inconsistent with a stance (failure to claim the Escrows as an asset) taken in prior litigation (Bentley's bankruptcy proceeding).

Although not a universally required element of judicial estoppel, it is clear the doctrine applies in Virginia only when

11

the parties to the disparate proceedings are the same.[6]  Compare

Lofton Ridge, 268 Va. at 382, 601 S.E.2d at 651, with Lowery, 92

F.3d at 223, n.3, and Ex Parte First Ala. Bank, 883 So.2d 1236,

1243-45 (Ala. 2003).  We recently reiterated this requirement in

Lofton Ridge, noting our previous holding in The Pittston Co. v.

O'Hara, 191 Va. 886, 902, 64 S.E. 34, 43 (1951).  "[T]he

doctrine of estoppel by inconsistent position [i.e., judicial

estoppel] does not apply to a prior proceeding in which the

parties are not the same."  Lofton Ridge, 268 Va. at 382, 601

S.E.2d at 651.

Bentley and SK&R are without question parties in interest

in the case at bar because each claims the Escrows.  Bentley and

SK&R were the parties before the Bankruptcy Court petitioning

for approval of the Contract.  Plainly, the required element of

the same parties is met in this case.

A prior inconsistent position and the same parties are not,

however, solely sufficient to support the application of

---

[6] An exception to this requirement may exist where the liability of one defendant is derivative of the liability of another; for example, "where the relation between the defendants in the two suits has been that of principal and agent, master and servant, or indemnitor and indemnitee."  Lofton Ridge, 268 Va. at 382-83, 601 S.E.2d at 651.  (citation omitted).

judicial estoppel.  As the Supreme Court noted in New Hampshire, at least one other element must be present.[7]

> Courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.  Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity.

532 U.S. at 750-51 (internal quotation marks and citations omitted).

The importance of this factor as a condition precedent to the application of judicial estoppel was highlighted by the United States Court of Appeals for the Fourth Circuit in Lowery.

> The insistence upon a court having accepted the party's prior inconsistent position ensures that judicial estoppel is applied in the narrowest of circumstances.  Indeed, the prior success rule narrows the scope of judicial estoppel to the point at which the necessity of protecting judicial integrity outweighs the ramifications of that protection upon the litigant and the judicial system.  Because of the harsh results attendant with precluding a party from asserting a position that would normally be available to the party, judicial estoppel must be applied with caution.

---

[7] In New Hampshire v. Maine, 532 U.S. 742, 751 (2001), the Supreme Court also cited another element of judicial estoppel: "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  An analysis of this element is not necessary to resolution of this case, and we express no opinion on the necessity of this factor in the application of judicial estoppel in Virginia.

Lowery, 92 F.3d at 225 (citations and internal quotation marks omitted).  Without the requirement that the prior court accepted the earlier inconsistent position, facts not material or relevant in the prior proceeding could be asserted as a bar to a party's cause of action in a later proceeding.

In the case at bar it is clear that the prior court, the Bankruptcy Court, placed no reliance on the absence of the Escrows as an asset of Bentley's bankruptcy estate.  The Bankruptcy Court's memorandum opinion and order of June 9, 2003, denying SK&R's motion to reopen Bentley's bankruptcy proceeding, noted that in approving the Contract the Court's "only role was to ensure that the terms of the sale did not prejudice or impair the rights of other creditors or the equity security holders." The Bankruptcy Court then observed that "no issues are raised which implicate specific rights protected by the Bankruptcy Code."  This was true, in part, because Bentley's Chapter 11 plan paid all creditors in full including the unsecured creditors.  The Bankruptcy Court explained that it agreed with Bentley that

> . . . there could be no meaningful "administration" of
> the escrowed funds because all claims have been paid
> or otherwise satisfied.  Assets are administered in
> bankruptcy in order to pay creditors.  After the
> creditors have received all to which they are
> entitled, any remaining assets simply revert back to
> the debtor.

Even though SK&R's secured claim against the Property was satisfied when SK&R acquired the Property, the Bankruptcy Court noted that SK&R, and consequently the Court, could not have relied on a transfer of the Escrows as a basis for approving the Contract:

> SK&R was not a third-party purchaser but was a creditor that was agreeing to release its claim against the debtor in exchange for the property. SK&R's counsel conceded at oral argument that SK&R was unaware of the existence of the cash escrow at the time it entered into the contract with the debtor and voted in favor of the debtor's plan. SK&R can hardly argue, therefore, that it expressly relied on receiving the escrow in exchange for waiving its claim.

It is clear that Bentley's prior inconsistent position regarding the Escrows was not accepted or relied upon by the Bankruptcy Court. Because this critical element of judicial estoppel is absent, the doctrine cannot be applied to Bentley in the case at bar. The trial court therefore erred in ruling that Bentley was estopped from asserting a claim to the Escrows because it took an inconsistent position in the Bankruptcy Court by failing to list the Escrows as an asset of its bankruptcy estate.[8]

---

[8] Had the facts in Bentley's bankruptcy proceeding been different, the judicial estoppel element that a prior inconsistent position must have been accepted by the prior court may have been met. In a Chapter 7 proceeding with less than full payout to all creditors, or in a Chapter 11 proceeding involving a cram down or reorganization plan resulting in less than a full payout to all creditors, the failure to list the

B.    The Plain Meaning of the Contract

Having determined the doctrine of judicial estoppel does not apply under the facts of this case, we next address Bentley and Denger's argument that the trial court failed to follow the plain meaning of the Contract in several respects. Specifically, Bentley and Denger aver the trial court erred in holding the Escrows were a development right and thus passed to SK&R under that term of the Contract. Further, Bentley and Denger contend the trial court ignored the plain meaning of "Property" in the Contract and improperly construed the Contract to include the Escrows as part of the "project." We agree with Bentley and Denger.

The parties do not dispute that the Contract is unambiguous, and the trial court agreed. "[W]hen contract terms are clear and unambiguous, we must construe those terms according to their plain meaning." Lansdowne Dev. Co., L.L.C. v. Xerox Realty Corp., 257 Va. 392, 400, 514 S.E.2d 157, 161 (1999). A court may not "add to the terms of the contracts of parties by construction, in order to meet the [circumstances] of a particular case." C. S. Luck & Sons, Inc. v. Boatwright, 157 Va. 490, 497, 162 S.E. 53, 55 (1932). We therefore examine the terms of the Contract as written.

Escrows could have been a fundamental factor affecting the Bankruptcy Court's decisions. See, e.g., Barger v. City of Cartersville, 348 F.3d 1289, 1294-95 (11th Cir. 2003).

16

The Contract specifically defined the term "Property" to be the delineated real property "together with all approvals, permits, development rights, consents and renewals thereof relating thereto." Nowhere in the Contract do the terms "project" or "Escrows" appear. Neither does the Contract contain an inference that something other than the "Property" is conveyed.

The trial court noted the sale of the Property took place during Bentley's bankruptcy proceeding and that the Contract, therefore, was "not just the sale of the real estate . . . but the salvage of the entire project." The trial court found in the March 12th order that "it was the intent of the parties to transfer the entire project . . . including the erosion control escrows."

The trial court implied that the Bankruptcy Court's Order approving the Contract included the entire River Oaks project, not just the Property in the confirmed conveyance. However, the term "project" does not appear in the Bankruptcy Court Order. To the contrary, that Order specifically recites that SK&R is to receive Bentley's interest in the "Property" under the "terms of the Contract" and approves the Contract.

> It is the function of the court to construe the contract made by the parties, not . . . to alter the contract they have made so as to conform it to the court's notion of the contract they should have made in view of the subject matter and the surrounding

17

> facts and circumstances. . . . The court . . . is not at liberty . . . to put a construction on the words the parties have used which they do not properly bear. It is the court's duty to declare what the instrument itself says it says.

Ames v. American Nat. Bank, 163 Va. 1, 38, 176 S.E. 204, 216 (1934).

The trial court's construction of the admittedly unambiguous Contract, transforming the mutually defined term of the conveyance, "Property," into the transfer of an unmentioned and undefined term, "Project," is plainly wrong. The trial court ignored the plain language of the Contract by adding provisions not included by the parties. This it cannot do. The trial court cannot conjure the conveyance of the Escrows under the rubric of "the project" when the parties have not chosen by the plain language of the Contract to do so.

Further, under the principle of expressio unius est exclusio alterius, the omission of a particular covenant or term from a contract reduced to writing shows an intent to exclude it. First Nat'l Bank v. Roy N. Ford Co., 219 Va. 942, 946, 252 S.E.2d 354, 357 (1979). As Property under the Contract does not include the Escrows, the trial court cannot add that asset to the items conveyed. Thus, unless the term "development rights," which is used in the Contract, includes the Escrows by definition, we must find that the Contract did not transfer the Escrows.

18

In examining the Contract's conveyance of "all approvals, permits, development rights, consents and renewals" as part of the Property, the trial court found that "an erosion control escrow constitutes a development right" because "this is an interest claim that the developer has, in this case SK&R, [in] the development, the improvement of this particular property. So I don't think it's a stretch to say that an erosion control escrow is a development right."[9]

Development rights are property rights. "Although less than a fee interest, development rights are beyond question a valuable right in property." Mission Springs, Inc. v. City of Spokane, 954 P.2d 250, 257 (Wash. 1998). While a deed or contract conveying a development right will often identify the scope of that right, that did not occur in this case. However, it is clear the Escrows are not an interest in real property or a related right to real property.

Rather, an escrow is "[a]n account held in trust or as security." Black's Law Dictionary 584 (8th ed. 2004). Whatever else a development right may encompass, it does not include a security interest like the Escrows unless the parties have so agreed. To hold otherwise would fundamentally alter the meaning of development rights and, again, add terms to the Contract not

---

[9] The trial court determined the Escrows were not an approval, consent or permit and no error was assigned to that finding.

agreed upon by the parties.  Had the parties wished, in addition to development rights, to convey any asset securing those rights, they could have done so.  They did not.  The trial court therefore erred in determining that the Contract conveyed the Escrows as a "development right."

As a consequence, the trial court's finding that no evidence supported Denger's claim to the Escrows is also untenable.  The trial court based its judgment as to Denger on the theory that the Escrows passed to SK&R as "development rights" which the Contract required "be free and clear of all liens, interest and encumbrances."  As Denger had not joined the Contract to note an exception to the lien-free conveyance of the Escrows, the trial court reasoned any claim by him violated that contractual covenant.

Having determined that the development rights do not include the Escrows, the trial court's basis for its decision as to Denger's claim to the Escrows is without foundation. Moreover, the record plainly reflects Denger's transfer of all the funds comprising the Escrows directly from his personal account to legal counsel's trust account and in turn, to the County.

### C.   Post-Contractual Conduct

In ruling from the bench that Bentley intended the Contract to convey the Escrows as part of the Project, as opposed to the

Property, the trial court hinged its analysis of the Contract on the parties' post-contractual conduct. That conduct consisted of one unilateral event, Bentley's failure to list the Escrows in its bankruptcy proceeding.

> I think [the finding that the escrow agreements are part of the project is] most strongly borne out by the conduct of the parties after they've entered into the contract. . . . [T]he controlling issue is really the conduct of the parties after they've entered into the contract . . . while Bently [sic] claims this is their asset, [it] does not include the [escrows as an asset] in the bankruptcy action. Nothing speaks louder to this Court to indicate to the Court, as far as Bently [sic] was concerned, those escrows were not part of an asset of Bently [sic].

In support of the trial court's use of post-contractual conduct to "interpret" the Contract, SK&R cites our decision in Bott v. N. Snellenburg & Co., Inc., 177 Va. 331, 340, 14 S.E.2d 372, 375 (1941). We noted therein:

> The well-recognized rule is that if a written instrument may have two interpretations, the courts, in endeavoring to determine the intention of the parties will follow the one which they put upon it by their own actions.

As we noted above, however, there was no ambiguity in the Contract, and its plain language conveyed only the defined Property, which did not include the Escrows as a "development right" or otherwise. As the plain meaning of the Contract yields but one interpretation, the trial court erred in deeming Bentley's post-contractual conduct as evidence of an intent contrary to the wording of the Contract. Where no "obscurity exists . . . the

21

acts of the parties done under the contracts" bear no weight "as an indication of their intention." <u>Moore v. Chesapeake & O. R. Co.</u>, 159 Va. 703, 730, 167 S.E. 351, 360 (1933) (citations omitted).

## IV. CONCLUSION

For the reasons set forth above, we hold that the trial court erred in finding that Bentley's failure to list the Escrows as an asset in its bankruptcy proceeding precluded assertion of a claim in this action. We also hold that the trial court erred by failing to accord the Contract its plain meaning, which did not transfer the Escrows either as Property or as a development right. Further, the trial court erred in its judgment that Denger had no claim to the Escrows. Therefore, the judgment of the trial court will be reversed and the case remanded for further proceedings in conformity with this opinion to determine the ownership of the Escrows as between Bentley and Denger.

<u>Reversed and remanded</u>.