# CIRCUIT COURT OF ROANOKE COUNTY

Selective Ins. Co. of Am.

v.

Karen Slone Bratton,
Administrator
of the Estate of
Richard Linwood Slone, et al.

Case No. CL10-1395

Karen Slone Bratton,
Administrator
of the Estate of
Richard Linwood Slone

v.

Selective Ins. Co. of Am. et al.

Case No. 11-1367

April 8, 2014

By Judge Charles N. Dorsey

In these declaratory judgment actions, Karen Slone Bratton seeks underinsured-motorist coverage from Selective Insurance Co. Ms. Bratton represents the estate of Richard Linwood Slone. On February 20, 2008, two

drunk drivers killed Richard Slone as he worked as a dump-truck driver for S. R. Draper Paving on a construction site. After a civil jury trial, Ms. Bratton obtained a $4.35 million joint-and-several judgment against the two drivers, but their insurance coverage is insufficient to cover their liability. Selective insured Mr. Slone's Draper Paving dump truck and a Draper Paving pick-up truck an employee drove to the jobsite that night. Under Selective's policy, each vehicle has $1 million in underinsured-motorist coverage available. Ms. Bratton argues she is entitled to this coverage.

This matter has a long and complicated procedural history. This insurance-coverage dispute arose after Ms. Bratton obtained a verdict in the civil jury trial against the two drivers. Over the course of this subsequent insurance-coverage dispute, the parties briefed two motions for summary judgment. Material issues of fact remained in dispute, however, and the Court held a bench trial on September 4, 2013. After the parties offered all of their evidence and the trial concluded, the parties submitted post-trial briefs arguing their factual and legal positions. After post-trial briefing concluded, Selective moved to strike a portion of Ms. Bratton's Reply Trial Memorandum.

For the reasons that follow, the Court will strike part of Ms. Bratton's Reply Trial Memorandum. In addition, having considered the facts and each party's arguments, the Court finds that Ms. Bratton is not entitled to Selective's UIM coverage because she has failed to prove that Mr. Slone was using the dump truck or the Draper Paving pick-up truck.

*Facts*

In February 2008, Mr. Slone worked for S. R. Draper Paving. Trial Tr. 15. At that time, Draper Paving was a subcontractor working for Ray Sink Pipeline Co., which was working on a project on Route 419 in Roanoke County. Ray Sink was laying water lines along the right edge of Route 419's southbound lanes. *Id.* 14-15. This required Ray Sink to cut a channel in the existing asphalt, and the channel needed to be patched. Draper Paving workers worked behind Ray Sink's workers, filling the open water-line channel with asphalt. *Id.* 15.

LMC Barricade, L.L.C., was also a subcontractor for Ray Sink, and it was responsible for coordinating the project's lane closures. *Id.* 42, 158. It obtained all the safety permits and set up the work zone, managing the safety logistics, and traffic control. Draper Paving did not play any role in managing the lane closures. Selective's Ex. 1, at 49.

On February 20, 2008, the Ray Sink and Draper Paving work crew was working south of Route 419's intersection with Ogden Road. There, Route 419 has two southbound lanes, and LMC Barricade set up the work zone as a right lane closure, closing the right southbound lane. Trial Tr. 114. Back in front of Tanglewood Mall, a flashing arrow board told drivers to merge left, and a sign warned that flaggers were ahead. *Id.* at 139-40. Just after

Ogden Road, traffic cones cut across Route 419 from the right-hand side at an angle towards the centerline, closing the right shoulder and southbound lane from there forward. *Id*. 36. LMC Barricade was unaware that Draper Paving would have to periodically work in the left lane. *Id*. 46-47.

Mr. Slone brought dump-truck loads of asphalt to the jobsite, and he would raise and lower the truck bed to pour asphalt into the bucket of a front-end loader. The front-end loader would then transfer the asphalt into the open water-line channel, and the Draper Paving workers would level the asphalt. *Id*. 19.

Draper Paving did not originally intend to use the front-end loader for this job. Instead, the crew planned to use a road widener, but it malfunctioned. *Id*. 18. This created at least two other concerns.

First, using the front-end loader changed the traffic pattern through the work zone. Originally, LMC Barricade only planned to close the right shoulder and lane because the road widener did not require the workers to go into the left lane. *Id*. 43-46. To use the front-end loader, however, the operator had to turn it around in the left lane, requiring periodic closures of that lane. *Id*. 17-19. No one at Draper Paving told anyone at LMC Barricade that Draper Paving now needed to encroach on the left lane, and LMC Barricade did not adjust the safety setup or traffic pattern to accommodate this change. *Id*. 46-47. Instead, a Draper Paving employee would grab a stop-slow sign and go out into the left lane to stop traffic whenever the front-end loader needed to maneuver into the left lane. *Id*. 19. Nothing gave drivers any advance warning that the left lane would be closed periodically. *Id*. 139.

Second, because the dump truck's bed was wider than the front-end loader's bucket, molten asphalt would spill around the bucket's sides when Mr. Slone would lift the bed. *Id*. 20. The crew was working at night in February, so the spilled asphalt cooled quickly on the ground, becoming rock hard. To avoid leaving rock-hard piles of asphalt on the road, Mr. Slone exited the dump truck periodically to check on this spillage. If it needed to be scraped up, he pulled the dump truck forward so the crew could scrape it from the road. *Id*. 20-21. The driver of the front-end loader, James Harmon, testified that Mr. Slone would get out and check for spillage "every two, three, four" pours of asphalt. *Id*. 20. According to Mr. Harmon, this was the only reason Mr. Slone exited the truck while on the jobsite. *Id*. 28-30.

The work proceeded this way until just after midnight on February 20, 2008, the second night of work. Right as Mr. Harmon was going to drop a load of asphalt into the open channel, he heard a shout. *Id*. 22, 24. He turned, noticed headlights approaching quickly, and braced for impact. Two drunk drivers had disregarded the flagger stopping traffic, and one after the other they crashed into the front-end loader, spinning it clockwise and into the dump truck. *Id*. 22. Soon after the accident, the Draper Paving employees found Mr. Slone pinned between the front-end loader and the dump truck's left-rear tires, which killed him. *Id*. 30-31.

*Issues*

1. Roger Hawks' deposition testimony, which Selective submitted to support its summary-judgment motion, states that he yelled at the oncoming drunk drivers as they approached. Mr. Hawks testified at the trial but did not testify that he yelled. Post-trial, Selective argues that Mr. Hawks did not yell at the cars. Should the Court estop Selective from arguing that Hawks did not yell, binding Selective to Mr. Hawks' deposition testimony?

2. Ms. Bratton is entitled to the dump truck's UIM coverage if Mr. Slone was using the dump truck. It was Mr. Slone's habit to exit the dump truck to check for spillage, and this was the only reason he would exit his truck. He was killed while he was out of his truck, but no one knows why he exited it. Based on this evidence, can the Court find by a preponderance of the evidence that Mr. Slone was using the dump truck?

3. On the night of the accident, Mr. Harmon parked his Draper Paving pickup truck just south of Route 419's intersection with Ogden Road. He left the truck's headlights, hazard lights, and amber strobe light on. Ms. Bratton is entitled to the pick-up truck's UIM coverage if Mr. Slone was using the truck. Ms. Bratton argues this truck served as a "shadow vehicle," protecting the workers. Was Mr. Slone using this pick-up truck?

*Analysis*

This matter arises out of cross-complaints seeking declaratory judgments on insurance coverage. The burden lies with Ms. Bratton to establish by a preponderance of the evidence that she is entitled to coverage. *Hartford Accident & Indemnity Co. v. Peach*, 193 Va. 260, 264-65, 68 S.E.2d 520, 522 (1952); *Travco Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 705 (E.D. Va. 2010).

## I. *Selective's Motion To Strike Portions of Ms. Bratton's Reply Trial Memorandum*

After the parties submitted their post-trial briefs, Selective moved to strike parts of Ms. Bratton's Reply Trial Memorandum. In the offending portions of her Reply Trial Memorandum, Ms. Bratton argues that Selective should be bound by Roger Hawks' deposition testimony. At his deposition, which Selective submitted to support its earlier summary-judgment motion. Mr. Hawks testified that he shouted at the drunk drivers to stop. The deposition was not part of the trial record because Mr. Hawks testified in person at trial and neither party sought to introduce the deposition in evidence.

In its post-trial brief, Selective argues that Mr. Slone was out of the dump truck to shout at Mr. Harmon, warning him about the approaching cars. According to Selective, the shouting Mr. Harmon heard before impact was Mr. Slone's because none of the trial evidence suggests that anyone else yelled at Mr. Harmon. This position, of course, conflicts with Mr. Hawks' deposition testimony that he shouted.

Ms. Bratton asserts that Selective should be judicially estopped from arguing that only Mr. Slone shouted. Selective moved to strike this argument from Ms. Bratton's Reply Trial Memorandum, arguing that Ms. Bratton is impermissibly trying to bring in facts from outside of the trial record.

Judicial estoppel is a slippery concept. It essentially prevents a party from taking inconsistent factual positions in litigation. *Lofton Ridge, L.L.C. v. Norfolk S. Ry.*, 268 Va. 377, 380-81, 601 S.E.2d 648, 650 (2004). Three factors must be met before the Court can apply the doctrine. *Bentley Funding Group, L.L.C. v. SK&R Group, L.L.C.*, 269 Va. 315, 326-27, 609 S.E.2d 49, 54-55 (2005).

First, the inconsistency must involve inconsistent factual positions. *Id.* at 326, 609 S.E.2d at 54. Second, the parties must be the same. *Id.* Finally, the estopped party must have previously convinced the trial court to accept its original factual position. *Id.* at 327, 609 S.E.2d at 54-55.

The Court will not estop Selective from arguing that only Mr. Slone yelled. Although Mr. Hawks stated in his deposition that he shouted at the drivers to stop, the Court never accepted or relied on this factual premise when it ruled on the summary judgment motions. Rather, the Court held that material issues of fact remained in dispute, denying the various motions for summary judgment. Accordingly, Selective can argue that only Mr. Slone yelled at the cars, and the Court will not consider Mr. Hawks' deposition testimony that he yelled, because it was not introduced into evidence at trial.

## II. *The Availability of UIM Coverage*

Ms. Bratton argues that, according to Virginia law and the insurance policy, she is entitled to Selective's UIM coverage. Virginia Code § 38.2-2206(A) requires that all motor-vehicle liability insurance policies provide uninsured and underinsured coverage to persons insured under the policies. An "insured" person is "any person who uses the motor vehicle to which the policy applies" with the express or implied consent of the "named insured." Va. Code § 38.2-2206(B). Selective's policy provides uninsured and underinsured coverage for anyone "occupying a covered auto" at the time of an injury giving rise to a claim. The policy defines "occupying" as "in, upon, using, getting in, on, out of, or off" the covered vehicle. Bratton's Ex. 38.

The parties agree that Mr. Slone was neither in nor upon the dump truck and that he was not getting in, on, off, or out of the dump truck. The parties also agree that Ms. Bratton is entitled to the UIM coverage only if Mr. Slone was "using" either or both of the insured vehicles at the time of his death. Ms. Bratton argues that Mr. Slone was using the dump truck and the pick-up truck, while Selective argues he was not using either vehicle.

Cases such as this one continually "vex litigants and trial courts," presenting "such an infinite variety of factual patterns that it is impossible to formulate bright-line rules of universal application or a list of factors dispositive of the issue in every case." *Simpson v. Virginia Mun. Liab.*

*Pool,* 279 Va. 694, 699, 692 S.E.2d 244, 247 (2010); *Slagle v. Hartford Ins. Co.,* 267 Va. 629, 633, 594 S.E.2d 582, 583 (2004). Although there is no set formula for deciding whether an individual was "using" an insured vehicle, the insurance contract's "using" provision should be construed in the light of the subject matter with which the parties were dealing, and the policy's terms should be given their ordinary meaning. *Travelers Ins. Co. v. LaClair,* 250 Va. 368, 371-72, 463 S.E.2d 461, 463 (1995). The use in which the vehicle was engaged must not have been outside the "objective and reasonable" contemplations of the parties to the insurance contract. *Simpson,* 279 Va. at 700, 692 S.E.2d at 247. Ultimately, however, the "critical inquiry" is "whether there was a causal relationship between the incident and the employment of the insured vehicle as a vehicle." *Slagle,* 267 Va. at 636, 594 S.E.2d at 586.

This causal relationship is established if the injured person was "using the insured vehicle as a vehicle and as an integral part of his mission." *Id.* (internal quotations omitted). The insured vehicle is used as a vehicle if it is being used in a manner for which it was specifically designed or equipped. *Randall v. Liberty Mut'l Ins. Co.,* 255 Va. 62, 66, 496 S.E.2d 54, 56 (1998). Use is not restricted to the vehicle's transportation function, and it need not be the "direct, proximate cause of the injury in the strict legal sense." *Slagle,* 267 Va. at 636, 594 E.E.2d at 586 (internal quotations omitted).

## A. *Was Mr. Slone "Using" the Dump Truck?*

Ms. Bratton argues that Mr. Slone was using the dump truck because he was checking for spilled asphalt.

### (1) *Ms. Bratton Has Not Proved by a Preponderance of the Evidence that Mr. Slone Was Checking for Spilled Asphalt*

For the Court to find that Mr. Slone was using the dump truck because he was checking for spilled asphalt, Ms. Bratton must prove that Mr. Slone was, in fact, checking for spilled asphalt. No one saw what Mr. Slone was doing right before he was killed, and he did not communicate his reason for exiting the truck to anyone. Ms. Bratton's Trial Memorandum, at 23. In fact, no one knew Mr. Slone was outside the truck until he was found after the accident. Trial Tr. 65, 101, 144, 150-51; Selective's Ex. 1, at 40. Ms. Bratton argues, however, that it was Mr. Slone's habit to check for spillage every two, three, or four pours, and that he never exited the truck for any other reason. Because this was his habit and because, before the collision, he only exited the truck to check for spillage, Ms. Bratton argues that Mr. Slone must have been checking for spillage at the time of the crash.

Selective argues that Mr. Slone's habit of checking for spillage does not prove he was checking for spillage on this occasion. According to Selective,

Ms. Bratton is asking the Court to impermissibly speculate about what Mr. Slone was doing.

The Court would not be speculating, however, if it could reasonably infer from the totality of the direct evidence that Mr. Slone was checking for spilled asphalt. Circumstantial evidence is competent to prove material facts. Here, the only disputed material fact is whether Mr. Slone was checking for spillage. If there is direct evidence from which the Court may reasonably infer that Mr. Slone was checking for spillage, the Court may properly make that conclusion. *Hoar v. Great E. Resort Mgmt.*, 256 Va. 374, 388, 506 S.E.2d 777, 786 (1998).

An individual's habitual practice is certainly probative of what the individual did in response to a particular set of circumstances. Va. Code § 8.01-397.1; Va. Sup. Ct. R. 2:406. Logically, however, the individual's habit is only probative if the proponent proves the conditions precedent to the habitual response. Thus, Mr. Slone's habit of exiting the dump truck to check for spillage every second, third, or fourth asphalt pour is only probative if this was Mr. Slone's second, third, or fourth pour.

The evidence conflicts, however, about whether this was Mr. Slone's first or a later asphalt pour. Mr. Harmon testified that the collision occurred immediately after Mr. Slone's third or fourth pour, but he was not sure. Trial Tr. 27. Roger Hawks, however, testified that this was Mr. Slone's first pour. *Id.* 142. He remembers this because, immediately before the crash, the crew took a break while they waited for Mr. Slone to bring a new load of asphalt. *Id.* 141-42.

Mr. Hawks also testified that, immediately before he accident, he realized that no one was stopping traffic. *Id.* 137-38. This suggests that Mr. Slone's last pour was the first that required Mr. Harmon to turn the front-end loader around in the left lane because the crew had to stop traffic to maneuver the front-end loader into that lane. Mr. Harmon did not have to turn around in the left lane on each bucketful; he only needed to do so when the ground crew was working close to the dump truck. *Id.* 53-55. But the Court does not know when or how often Mr. Harmon would need to work close to the dump truck. Thus, from this evidence, the Court can only conclude that (1) Mr. Harmon was working close to the dump truck and (2) this was the first time he had to turn around in the left lane.

Ms. Bratton points to the photographs showing spilled asphalt under the dump truck to argue that Mr. Slone was checking for asphalt. Bratton's Ex. 26. Asphalt spilled on every pour, Trial Tr. 20, however, and the spilled amounts varied. *Id.* 26. Nothing leads the Court to conclude that the spilled asphalt evident in the photographs is greater than the amount that would spill on the first pour.

Weighing the conflicting testimony regarding which number pour Mr. Slone was on, the Court finds that Mr. Hawks was a more credible witness. On numerous occasions during trial, Mr. Harmon made statements

inconsistent with sworn statements he had made in the past. When confronted with these past statements, Mr. Harmon would equivocate or admit he was uncertain. *Id.* 64, 71, 72-73, 79-80, 81-82, 83-84. Compounding the Court's reluctance to credit Mr. Harmon's testimony is the fact that Mr. Harmon admitted uncertainty about which pour Mr. Slone was on. *Id.* 27.

Given the conflicts and gaps in the evidence about whether Mr. Slone's last load of asphalt was his first or a later load and that Mr. Hawks was a more credible witness, the Court finds that Ms. Bratton has not met her burden of proof. The Court cannot find, based simply on Mr. Slone's habit and the conflicting evidence about what pour he was on, that Mr. Slone was checking for spilled asphalt.

Ms. Bratton asserts that Mr. Slone was using the dump truck because he was checking for spilled asphalt. Because she has not proved that he was checking for spilled asphalt, she has not proved that Mr. Slone was using the dump truck.

## B. *Was Mr. Slone "Using" Harmon's Draper Paving Pick-Up Truck?*

Ms. Bratton also argues that Mr. Slone was using Mr. Harmon's Draper Paving pick-up truck as a "shadow vehicle," a parked vehicle that serves as a traffic barrier. According to Ms. Bratton, this means that Mr. Slone was using the pick-up truck within the insurance policy's meaning.

On the night of the accident, Mr. Harmon drove his Draper Paving Chevrolet Silverado 3500 to the jobsite. *Id.* 31. Mr. Harmon regularly used the truck to haul people, tools, and water to jobsites, and it was equipped with a utility bed, tool boxes, and an amber strobe light. *Id.* 31-32, 39. On the night of the accident, Mr. Harmon parked the truck after Ogden Road's intersection with Route 419 and just inside the traffic cones that cut across Route 419's right southbound lane. *Id.* 36. Mr. Harmon left the truck's strobe light, headlights, and hazard lights on throughout the night. *Id.* 36, 39. At the time of the accident, the truck was 200 feet from Mr. Slone's dump truck. *Id.* 82.

Ms. Bratton argues that Mr. Harmon's truck was being used as a "shadow vehicle." According to the Virginia Work Area Protection Manual, a "shadow vehicle" is a vehicle that is used as a barricade to shield workers on a jobsite from oncoming traffic. Bratton's Ex. 39, at 6H-28; Ms. Bratton's exhibit 39 is the 2005 edition of the Virginia Work Area Protection Manual. The Virginia Work Area Protection Manual (WAPM) is "the bible" of work-zone safety, and it is used by construction crews throughout Virginia. Trial Tr. 108. It prescribes how lane closures should be set up to comply with state and federal laws protecting motorists and workers. Bratton's Ex. 39, at Introduction.

According to the WAPM, the right-lane closure set up by LMC Barricade required a shadow vehicle with an arrow panel or an illuminated strobe light. *Id.* at 6H-28. Ms. Bratton asserts that Mr. Harmon's pick-up truck

served as the required shadow vehicle and that Mr. Slone and, inferentially, every other worker on the jobsite used the pick-up truck for protection.

### (1) *Mr. Slone Was Not Using the Pick-Up Truck*

Mr. Slone was not using the pick-up truck within the meaning of Va. Code § 38.2-2206(A) or Selective's UIM policy. Again, Mr. Slone was using the pick-up truck if he was using it "as a vehicle and as an integral part of his mission." *Slagle*, 267 Va. at 636, 594 S.E.2d at 586. A vehicle is used as a vehicle if it is used in a manner for which it was specifically designed or equipped. *Randall*, 255 Va. at 66, 496 S.E.2d at 56.

Although the pick-up truck had an amber strobe light, the work crew was not using it as a shadow vehicle. Mr. Harmon used his truck to bring people, tools, and water to jobsites. Trial Tr. 31-32, 39. On the night of the accident, he parked his truck at the beginning of the jobsite not because anyone told him to do so or because it was supposed to serve as the site's shadow vehicle, but because this was his habit. *Id.* 34, 82-83. It was his habit to turn on the truck's hazard lights, headlights, and strobe light and park it at the jobsite with "whatever else [the crew] had" to protect the workers. *Id.* 34. Draper Paving was not responsible for setting up the lane closure for this job. *Id.* 42, 158; Selective's Ex. 1, at 49. And given both Mr. Harmon's and Mr. Hopkins's unfamiliarity with the WAPM, the Court does not believe that Draper Paving was regularly responsible for setting up lane closures or providing shadow vehicles. Accordingly, Mr. Harmon's pick-up truck was not being used as a shadow vehicle on this jobsite. Instead, Mr. Harmon used it to bring himself and tools to the jobsite.

In addition and in the alternative, after considering the WAPM, the Court is not convinced that Mr. Harmon's truck qualifies as a shadow vehicle. According to the WAPM, a shadow vehicle must be parked between 50 and 100 feet from the first work crew. Bratton's Ex. 39, at 6H-28. Instead, the pick-up truck was 200 feet from the first work crew. Trial Tr. 82.

Although Mr. Slone's dump truck, the front-end loader, and Draper Paving's ground workers were 200 feet from Mr. Harmon's pick-up, Ms. Bratton argues that this was not the first work crew. Instead, she asserts that Mr. Hawks, who was flagging, was the first work crew. According to the WAPM, however, flaggers are not part of the first work crew for purposes of determining where the shadow vehicle must be placed. Bratton's Ex. 39, at 6H-41. Instead, the first work crew was at Mr. Slone's dump truck, 200 feet from the shadow vehicle.

Ms. Bratton also argues that WAPM provides general guidelines and that the 50-to-100-feet rule is not absolute. The WAPM, however, does not allow for this amount of leeway. Although the WAPM provides "guidelines" and is not a "substitute for engineering judgment," the WAPM also provides certain "standards" that are "required." *Id.* at Introduction. The 50-to-100-feet rule is a standard, not a guideline. *Id.* at 6H-28.

148

The Court recognizes that worksites are fluid operations and work crews must be given leeway to set up the site, but the 50-to-100-feet rule does provide for leeway. The shadow vehicle can be as close as 50 feet and as far as 100 feet, providing leeway for the crew to work away from the shadow vehicle. Here, however, the first work crew was 200 feet from the shadow vehicle, far outside the maximum "required" distance. Trial Tr. 82.

Finally, like the landscaper in *United States Fire Ins. Co. v. Parker*, Mr. Slone was not using the truck as an integral part of his mission. 250 Va. 374, 377-78, 463 S.E.2d 464, 466 (1995). In *Parker*, a landscaper working on the roadside parked her truck to provide a safety barrier, protecting her from speeding motorists. *Id.* at 376, 463 S.E.2d at 465. Distinguishing the case from *Great Am. Ins. Co. v. Cassell*, 239 Va. 421, 389 S.E.2d 476 (1990), the Court found that the landscaper was not using her truck. *Parker*, 250 Va. at 378, 463 S.E.2d at 466.

*Cassell* held that a fireman was using a fire truck that was parked to control traffic and protect the firefighters. The fireman used the fire truck as an integral part of his mission, and he was engaged in a transaction essential to the use of the fire truck itself. The truck had to be parked as it was so that the firefighters could do their job. 239 Va. at 424, 389 S.E.2d at 477.

In *Parker*, however, the landscaper was not using her truck as an integral part of her mission, and she was not engaged in a transaction essential to its use. 250 Va. at 378, 463 S.E.2d at 466. Although the truck offered protection, no one instructed her to use it that way, it was not part of an official safety array, and she did not need it to accomplish her landscaping duties. *Id.* at 376-78, 463 S.E.2d at 465-66.

Here, at the time of the accident, Mr. Harmon's truck was 200 feet away from Mr. Slone's dump truck. Trial Tr. 82. Nothing suggests that Mr. Slone knew the truck was there. Mr. Harmon only parked it there because it was his regular habit to park his truck at the beginning of the worksite, along with whatever else was being used to protect workers. The truck was not part of the road closure, and no one ordered Mr. Harmon to park his truck there. *Id.* 34. Draper Paving had nothing to do with setting up the jobsite, as it was not responsible for arranging the lane closure or ensuring that the closure complied with the WAPM. *Id.* 42, 158; Selective's Ex. 1, at 49.

Mr. Harmon's subjective intent to use the pick-up truck for extra protection does not mean Mr. Slone was objectively using the truck. Mr. Slone's mission included transporting asphalt to the jobsite, pouring the asphalt, and checking for spillage. Mr. Slone did not rely on the pick-up truck to perform any of these duties. To him, the pick-up truck was nothing more than a rolling barricade, and, if it offered him any protection from 200 feet away, it was just another barricade among all the other safety equipment at the site. Because of this, Mr. Slone did not use it as an integral part of his mission.

*(2) Use of the Pick-Up Truck as a Shadow Vehicle Was Not Within the Parties' Reasonable Contemplations*

Even if Mr. Slone had used the pick-up truck as a shadow vehicle, that use was outside the parties' "objective and reasonable" contemplations. Because of this, Mr. Slone was not using the pick-up within the meaning of Selective's policy or Va. Code § 38.2-2206(A). *Simpson*, 279 Va. at 700, 692 S.E.2d at 247.

Selective had no reason to believe that it was providing UIM coverage to every worker on the jobsite that night. Draper Paving was not regularly responsible for managing lane closures, and Mr. Harmon's truck was not regularly used as a shadow vehicle. Trial Tr. 34. On this project, LMC Barricade was responsible for the lane closure, and no one at LMC Barricade or Draper Paving told Mr. Harmon to use his pick-up truck as a shadow vehicle. *Id.* 42, 158; Selective's Ex. 1, at 49. Although Mr. Harmon may have intended to use his truck to offer additional protection to the work crew, Selective had no objective or reasonable indication that Mr. Harmon's truck would be an integral part of the lane closure. Accordingly, it had no reason to believe that Draper Paving would use the pick-up truck to protect every worker on the jobsite. Thus, this alleged use is not entitled to coverage under Selective's policy or Va. Code § 38.2-2206(A).

### Conclusion

The Court finds that Mr. Slone was not using the dump truck or Mr. Harmon's pick-up truck. Accordingly, Ms. Bratton is not entitled to Selective's UIM coverage.

The Court understands that this is a harsh result for Ms. Bratton. This has been a long, drawn-out process for her, and the Court sympathizes with her senseless loss. Indeed, this case presents one of those situations where

> Plaintiff[] rightly argue[s] that this is a harsh result. [And] Defendant[] rightly argue[s] that [it] did all that it was required . . . and relief for the plaintiff[] would impose a harsh result on [it].
>
> This issue is not one to be decided on equitable principles. Rather it is a matter of the law.

*Price v. Chavis*, 65 Va. Cir. 159, 160 (Richmond 2004).

To make matters worse, Mr. Slone was the innocent victim of a drunk-driving accident. Deaths caused by drunk driving are particularly insulting to society because they are entirely preventable. Drunk drivers pose heightened risks to road workers who must work at night. By all accounts, Mr. Slone was an outstanding person and father. He was safety conscious and a good worker.

Based on the evidence, however, the Court simply cannot accurately nor fairly conclude that Mr. Slone was using either vehicle. "Nevertheless, I find no solace in following a view that admittedly produces a harsh result . . . ." *Nerri v. Adu-Gyamfi*, 270 Va. 28, 32-33, 613 S.E.2d 429, 431 (2005) (Koontz, J., dissenting).

The Court understands that the parties have worked out how its ruling affects other interested parties' liabilities and obligations.