## Richmond

## The First National Bank of Martinsville and Henry County and Charles E. Carter, Trustee

v.

## Roy N. Ford Company, Incorporated

March 2, 1979.

Record No. 771148.

Present: All the Justices.

*Charles E. Carter (Carter, Craig & Bass,* on brief), for appellants.

*J. William Clement (Clement and Fowler,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

This appeal raises questions regarding the validity of a mechanic's lien and several purported waivers.

Roy N. Ford company, Inc. (hereinafter, Ford in proper person), a subcontractor, performed certain demolition, excavation, and paving work for the general contractor, Eagle Construction Company, Inc. (Eagle), on three projects known as King's Court, Tech Mod, and Robin Court. King's Court was an apartment complex developed by Pittsylvania County Christian Housing, Inc. The First National Bank of Martinsville and Henry County held liens aggregating $728,300 under certain deeds of trust on King's Court.

Ford filed his memorandum of mechanic's lien on King's Court in June, 1972, claiming $25,229.52 for labor and materials. On October 2, 1972, he filed a bill of complaint to enforce his lien. Named as parties defendant were the developer, the general contractor, the bank, and Charles E. Carter, trustee under the deeds of trust. In their answers, the defendants alleged that Ford had waived his lien.

The cause was referred to a commissioner in chancery who took evidence and filed a report upholding Ford's lien. Later, the cause was submitted to a second commissioner who also upheld the lien but deducted from the amount claimed the sum of $1,641.18 for labor and materials furnished on the Robin Court and Tech Mod projects. By final decree entered June 3, 1977, the chancellor confirmed the second commissioner's report and ordered the property sold. The bank and the trustee (collectively, the bank) assign three errors on appeal, and Ford assigns cross-error to the reduction in the quantum of his lien.

In support of its first assignment, the bank argues that, by including in his memorandum debts due on projects other than King's Court, Ford forfeited his right to any lien under the language of Code § 43-23.1. At the time the memorandum was filed, the statute provided:

> Any person who shall *knowingly* include in his memorandum of lien work not performed upon or materials not furnished for the property described in his memorandum shall there-

by forfeit any right to a lien under this chapter
(emphasis added).

The bank maintains the word "knowingly" means nothing more than "with knowledge". So construed, however, the word is merely an antonym of "accidentally". The law does not favor forfeitures, and looking to the context in which the word is cast in this statute, we read "knowingly" as an antonym of "innocently" and a synonym of "designedly" and "with intent to mislead". *See State* v. *Toombs*, 324 Mo. 819, 835, 25 S.W.2d 101, 108 (1930) and *State* v. *Halida*, 28 W. Va. 499, 504 (1886). During the pendency of the cause below, the General Assembly amended the statute by substituting the words "with intent to mislead" for the word "knowingly". Acts. 1976, c. 253. We do not agree with the bank's argument that the amendment constituted a substantive change in the statute. Rather, we believe the amendment was enacted simply to reinforce the original legislative intent by clarifying an after-discovered semantical ambiguity.

■ Here, the commissioner found there was no evidence of an intent to mislead. Ford's memorandum was based upon a statement of account supplied at Eagle's request only four days before the memorandum was filed. That account summarized in separate columns all the invoices (as corrected) billed to the three projects, credits for payments as received, and the net amount due. These data corresponded fully with the invoices received by Eagle and with the amount claimed in the memorandum of lien. In light of this detailed disclosure and absent evidence of an intent to mislead, we affirm the chancellor's ruling against forfeiture.

■ Yet, a lienor may not enforce a lien against one project for the cost of labor or materials furnished on another, and, rejecting Ford's contention on cross-error, we hold that the chancellor correctly excluded the claims attributable to the Tech Mod and Robin Court projects. *See Mills* v. *Moore's Super Stores*, 217 Va. 276, 281, 227 S.E.2d 719, 723 (1976).

■ Ford acknowledged his signature on several printed forms entitled "Partial Waiver and Release of Lien". The last document was signed after all invoices (except one for $500) had been submitted. Each document recited, as a "partial payment", a specific sum paid Ford on the King's Court project. Confirming the commissioner's finding, the chancellor held that the waiver applied only to the extent of the sum recited in each document. Challenging this holding, the bank construes each document as a

waiver of Ford's "right to file a lien for any sums due as of the date each waiver was signed" and argues, therefore, that the waiver extended to all claims except the $500 invoice.

Each document provided that "this is a Partial Waiver and Release of Lien ... only to the extent of the payments specified and only for materials furnished or work done up until Date ...." Ford testified that, when asked to sign "a general waiver ... I would not sign it", but when handed a "partial waiver ... I signed for what money he actually paid me." The first portion of the language quoted from the documents tends to support Ford's interpretation. The second portion tends to support the bank's interpretation. But in the second portion, there was a significant omission; in each document, the date space was left blank.

The omission of a particular covenant or term from a contract reduced to writing shows an intent to exclude it. *See* 17 Am. Jur.2d *Contracts* § 255 (1964). Moreover, even if, as the bank contends, the date contemplated was "the date each waiver was signed", still the language as a whole arguably supports two antithetical interpretations. Under familiar rules of construction, this ambiguity must be construed against the bank, the party who supplied the printed forms.

Applying these principles to the circumstances of this case, we cannot say that the chancellor erred in his ruling on this question.

■ Finally, the bank contends that the chancellor erred in upholding the commissioner's refusal to hear additional evidence proving the authenticity of Ford's signature on two other documents entitled "Waiver of Liens". These documents provided that Ford waived his right to a lien "for all services rendered, work done and material furnished heretofore and hereafter" on the King's Court project.

The bank introduced these two documents at the first commissioner's hearing on June 25, 1975. Asked to verify the handwriting, Ford testified, "It doesn't look like my signature. . . . I am not denying it. I don't remember signing it." The commissioner then granted a motion offered by counsel for Eagle "to continue the hearing . . . to give the defendants ample time to determine they may or may not be his signatures." Although no further evidence was taken in the interim, the commissioner filed a report on June 23, 1976 concluding that "[n]one of the 'waiver of liens' signed was a general waiver". The report does not state the ground for this conclusion, and it is unclear from the context whether it was based upon a finding that Ford's signatures were not genuine or upon a

ruling that the partial waiver documents did not have the effect urged by the bank.

Upon Eagle's motion, the cause was submitted to a second commissioner who took additional evidence on December 1, 1976. At that time, Ford stated categorically that the two signatures were not his. The following month, the bank informed the commissioner that "the Notary Public who took Mr. Ford's acknowledgement of his signature" had been located and requested an opportunity to present her testimony. The commissioner refused the request and filed his report. Noting that the validity of Ford's signatures "on certain of the waivers has been questioned" and finding that "none of the waivers given by Mr. Ford were intended to be general", the commissioner accorded Ford's lien priority over the bank's liens. In a letter opinion confirming the report, the chancellor sustained the commissioner's refusal on the ground that the bank had failed for "some 17 months after the taking of the first evidence" to produce evidence of the authenticity of Ford's signatures. Manifestly, the chancellor assumed that the bank had the burden of going forward with evidence of authenticity. In that assumption, the chancellor erred.

The bank's proffer was highly relevant to the critical issue in the cause. In our view, the language within the four corners of the two documents constituted general waivers of all liens on the King's Court project. If the signatures on those documents were authentic, then the bank's liens had first priority; if the signatures were forgeries, then Ford's lien was superior.

> Forgery is a felony. Its commission will not ·be presumed. Every presumption is in favor of innocence and not of guilt. When relied upon for the cancellation of an instrument [here, a deed], it must be proved by clear and satisfactory evidence - evidence that is positive, cogent, and convincing. (citations omitted).

*New* v. *Harman Coal Corp.*, 181 Va. 627, 634, 26 S.E.2d 39, 42 (1943).

Equivocating originally, Ford ultimately denied absolutely that the signatures were his. Construing Code § 8.3-307, a part of the Uniform Commercial Code, we have held that where the effectiveness of a signature on a negotiable instrument is put in issue by a

specific denial, the signature is presumed to be genuine or authorized, and the party claiming under the signature is not put to his proof until the party making the denial has produced "some evidence . . . which would support a finding that the signature is forged or unauthorized." *Virginia National Bank* v. *Holt,* 216 Va. 500, 503, 219 S.E.2d 881, 883 .(1975). "A forgery or an unauthorized signature may not be shown by merely demonstrating the [other party's] apparent lack of evidence on that issue." *Id.* at 503, 219 S.E.2d at 884.

Applying the rule in *New* and, by analogy, the principles stated in *Holt,* we hold that, upon production of the documents bearing what purported to be Ford's signatures, the bank was entitled to a presumption of genuineness; that, upon Ford's denial, the burden of producing evidence in support thereof was upon Ford; that the chancellor erred in placing the burden of going forward with the evidence upon the bank; that Ford failed to carry his burden; and that the decree will be reversed.

We hold further, however, that, since Ford had no reason at trial to assume a burden of which he had been relieved by the chancellor's error, equity requires that the cause be remanded for further hearings on the authenticity of Ford's signatures and for such further proceedings in accord with this opinion as the cause may require.

*Affirmed in part,*
*reversed in part,*
*and remanded.*