BLUE CROSS OF SOUTHWESTERN VIRGINIA AND BLUE
SHIELD OF SOUTHWESTERN VIRGINIA

V.

MCDEVITT & STREET COMPANY, ET AL.

Record No. 840870

October 9, 1987

Present: All the Justices

*Guy M. Harbert, III (William O. Tune, Jr.; Jim H. Guynn, Jr.; Gentry, Locke, Rakes & Moore*, on briefs), for appellant.
*Claude M. Lauck; Edward E. Nicholas, III (Mark E. Feldmann; Murray H. Wright; Glenn, Flippin, Feldmann & Darby; McGuire, Woods & Battle*, on briefs), for appellees.

POFF, J., delivered the opinion of the Court.

We granted this appeal to consider whether the trial court erred in ruling that an owner of a building contractually had waived its rights to recover from the general contractor and the architect damages for a loss covered by a property insurance policy.

Blue Cross of Southwestern Virginia and Blue Shield of Southwestern Virginia (collectively, the owner) engaged the partners in Hayes, Seay, Mattern & Mattern (the architect) to design, and McDevitt & Street Company (the contractor) to construct, the owner's headquarters building in Roanoke. The three parties memorialized their agreements in form contracts published by the American Institute of Architects (AIA), each of which was modified in part. Insofar as relevant to this appeal, paragraph 11.4 of the architect's contract provided:

11.4 The Owner and the Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages covered by any property insurance during construction . . . . The Owner and the Architect each shall require appropriate similar waivers from their contractors, consultants and agents.

Both the contractor's and the architect's contracts with the owner incorporated by reference the provisions of AIA Document A201 entitled "General Conditions of the Contract for Construction". For purposes of interpretation, paragraph 1.1.3 of that document defined the term "the Work" as follows:

The Work comprises the completed construction required by the Contract Documents and includes all labor necessary to produce such construction, and all materials and equipment incorporated or to be incorporated in such construction.

The term thus defined appears in two paragraphs of the general conditions that are crucial to the determination of the waiver issue framed on appeal:

11.3.1 Unless otherwise provided, the Owner shall purchase and maintain property insurance upon *the entire Work* at the site to the full insurable value thereof. This insurance shall include the interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in *the Work* and shall insure against the perils of fire and extended coverage and shall include "all risk" insurance for physical loss or damage including, without duplication of coverage, theft, vandalism and malicious mischief.

. . . .

11.3.6 The Owner and Contractor waive all rights against (1) each other and the Subcontractors, Sub-subcontractors, agents and employees each of the other, and (2) the Architect and separate contractors, if any, and their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other perils to the extent covered by insurance obtained pursuant to this Paragraph 11.3 or any other property insurance applicable to *the Work* . . . . The Owner

or the Contractor, as appropriate, shall require of the Architect, separate contractors, Subcontractors and Sub-subcontractors by appropriate agreements . . . similar waivers each in favor of all other parties . . . .

(Emphasis added.)

The parties agree that the building was substantially complete on September 2, 1981 and that, pursuant to a temporary certificate of occupancy, the owner occupied and began using the building on September 7, 1981. On January 11, 1982, the water in a pipe in the third-floor ceiling sprinkler system froze and the pipe burst. As appears from the parties' stipulation of facts, "[t]he 'Work' to be performed . . . had been substantially, although not fully, completed at the time of the freezing and bursting".

Pursuant to its commitment under the contract documents, the owner had acquired two policies of property insurance on the building. One, a policy containing a builder's risk endorsement, was in effect from December 1, 1979 to October 1, 1981. Coverage under the other began October 1, 1981 and was in effect on and after January 11, 1982. The loss was one covered by the latter policy, and the insurer paid the owner $109,116.54 in satisfaction of its claim.

The City of Roanoke issued a final certificate of occupancy dated February 10, 1982. The contractor submitted an application March 17, 1983 for final payment for the "Period from: 2-28-83 to: 3-17-83". The owner made final payment by check dated April 8, 1983.

In a motion for judgment filed in the name of the owner, the plaintiff claimed damages in contract and in tort against the contractor, the architect, and others.[1] The principal defendants filed special pleas of waiver and estoppel, and the parties submitted a stipulation of facts and memoranda of law. The stipulation contained no reference to extrinsic evidence of contractual intent. Construing the provisions of the contract documents and applying them to the facts at bar, the trial court ruled that the owner con-

---

[1] In oral argument, counsel for the appellant acknowledged that the owner's unnamed subrogee-insurer was the real party-plaintiff in interest. Those named as individual parties-defendant were (then or formerly) partners doing business as the architect, viz., H. Boyd Dickenson, Byrd H. Barksdale, Jr., John R. Hildebrand, Eric T. Naschold, Jr., Fletcher F. Rush, J. Oliver Stein, James M. Strickland, Jr., John P. Bradshaw, Jr., Cecil G. Doyle, and T. Howard Noel. Other parties-litigant were dismissed by orders of nonsuit.

tractually had waived its rights against the contractor and the architect and dismissed the motion for judgment.

As framed on appeal, the dispositive issue is whether the trial court misconstrued and misapplied the contract documents. Preliminarily, the owner complains that the language is ambiguous, that "[t]he architect and contractor should be considered the drafters of the documents because they submitted the forms", and that the trial court should have applied the rule that ambiguous contracts must be construed strictly against the author.

■ We have applied the rule the owner invokes against "the party who supplied . . . printed forms" when "the language as a whole arguably supports two antithetical interpretations." *Bank of Martinsville v. Ford*, 219 Va. 942, 946, 252 S.E.2d 354, 357 (1979). The rule applies, however, only when the contract is ambiguous on its face. When, as here, the language is plain and unambiguous, this Court must give effect to the plain meaning of that language. *Amos v. Coffey*, 228 Va. 88, 92, 320 S.E.2d 335, 337 (1984); *accord Berry v. Klinger*, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983).

On appeal, the owner contends that the waiver provision in paragraph 11.4 of the architect's contract applies only "during construction"; that the loss in issue "occurred after substantial completion and therefore not 'during construction' "; and that "the insurance and the waiver must lapse simultaneously at substantial completion and occupancy." The owner reasons that "[t]he risk of casualty damage . . . is on the contractor until the date of substantial completion, at which time the risk shifts to the owner", that the contractor then has no insurable interest in the project, and, consequently, that the only claim contemplated by the waiver provision was a claim covered by "builder's risk insurance".[2]

■ We are of opinion that both the contractor and the architect had insurable interests subject to the property insurance in effect on the date of the loss. Former Code § 38.1-331 (now § 38.2-

---

[2] Pursuing such reasoning, the owner insists that the contract implicitly provided that "the required insurance coverage would terminate upon total occupancy of the building." Referring to paragraph 11.3.9 of the general conditions, the owner says that "[t]he provision relating to partial occupancy clearly states that partial occupancy will not cause the insurance coverage to lapse, and, by implication, suggests that full occupancy . . . would cause a lapse." We decline to draw the inference the owner urges, because it has no predicate in the stipulated facts. Paragraph 11.3.9 applies to occupancy "prior to Substantial Completion"; the owner occupied the building after substantial completion.

303(B)) defined the term "insurable interest" as "any lawful and substantial economic interest in the safety or preservation of the subject of insurance free from loss, destruction or pecuniary damage." Although the building was substantially complete and occupied, until final payment was made, the property constituted inchoate security for the payment of contract debts due the contractor and the architect for performance of the entire work. Thus, at the time the loss occurred — three months before the date of final payment — both the contractor and the architect had a substantial economic interest in preserving the building from loss.

 And we do not agree with the owner's view that the only claim contemplated by the waiver provisions was a claim covered by "builder's risk insurance". We find no mention of that term in any contract and nothing that limits the operation of the insurance and waiver provisions to the time of substantial completion or occupancy. On the contrary, paragraph 11.3.1 of the general conditions, incorporated by reference in the principal contracts, required the owner to "purchase and maintain property insurance upon the entire Work" insuring "the interests of . . . [all parties] in the Work" against "all risk[s]". The waiver clause in paragraph 11.3.6 of the general conditions applied not only to claims "covered by insurance obtained pursuant to this Paragraph" but also to claims covered by "any other property insurance applicable to the Work". Paragraph 1.1.3 of the general conditions defined "the Work" as "the *completed* construction required by the Contract Documents [including] *all* labor necessary to produce *such* construction, and *all* materials and equipment incorporated or to be incorporated in *such* construction." (Emphasis added.)

As we read this language, part of both principal contracts, the loss suffered by the owner occurred while "the Work" was still in progress.[3] True, the insurance policy containing the builder's risk endorsement had expired. But the waiver clause provides that it applies to claims for losses covered by any property insurance applicable to "the Work", and the owner's second policy of property insurance was in effect when the loss occurred.

 Read together, the insurance and waiver provisions in the three contract documents signify a consensus among the con-

---

[3] As the owner acknowledged in the court below, work was being conducted to repair defects in the heating system in the building on the morning of January 11, 1982, the day the pipe froze and burst.

tracting parties to exempt themselves from liability *inter se*. Said differently, the contracts show that the parties agreed to shift the risk of loss from themselves to a commercial insurer by acquiring policies insuring their own interests and the interests of subcontractors and sub-subcontractors.

As those contracts were construed and applied by the trial court to the facts stipulated by the parties, the waiver provisions contemplated the kind of loss that occurred in this case, the time it occurred, and the kind of insurance policy in effect at that time. We agree with the interpretation underlying the court's conclusions, and we will affirm the judgment.

*Affirmed.*