COURT OF APPEALS OF VIRGINIA

Present:   Judges Huff, Athey and Fulton
Argued at Lexington, Virginia

**PUBLISHED**

YELLOW MOUNTAIN VILLAGE
 MOBIL HOME PARK ASSOCIATION, ET AL.

v.      Record No. 1638-23-3

YELLOW MOUNTAIN MHP, LLC

OPINION BY
JUDGE JUNIUS P. FULTON, III
OCTOBER 1, 2024

FROM THE CIRCUIT COURT OF ROANOKE COUNTY
James R. Swanson, Judge

Jarryd Smith (David D. Beidler; Emily Faye Jewett; Mona A. Raza;
Zachary Brown; W. Hunter Hartley; Legal Aid Society of Roanoke
Valley, on briefs), for appellants.

Justin S. Feinman (John A. Irvin; Williams Mullen, on brief), for
appellee.

This appeal arises out of a dispute between Yellow Mountain Village Mobil Home Park

Association ("Tenants"), the tenants of a mobile home park, and Yellow Mountain MHP, LLC

("Landlord"), the owner and landlord of the property.  The issues raised in this appeal revolve

around Landlord's ability, pursuant to the residential lease, to unilaterally raise the lot rents of

Tenants "mid-term."  Specifically, Tenants challenge Landlord's reliance on certain provisions

contained in the lease which purport to grant Landlord the unilateral ability to raise lot rents at any

time, as well as the legality of those provisions.

Tenants filed two interrelated actions seeking declaratory judgment and injunctive relief

prohibiting Landlord from raising lot rents, as well as charging a trash utility fee.  Both parties filed

motions for summary judgment in each action.  The trial court heard oral arguments on the cross-

motions for summary judgment and ultimately ruled in favor of Landlord, holding that the

challenged portions of the lease could be read together to grant Landlord the unilateral authority to raise lot rents and that the lease provisions were legal and enforceable under the relevant statutory scheme. The trial court entered an order on August 29, 2023, dismissing both matters with prejudice. Tenants timely appealed.

BACKGROUND

In February 2022, Landlord purchased the Yellow Mountain Mobile Home Park (the "Park"). After determining that the Park needed certain improvements to its infrastructure and amenities, Landlord "commenced a campaign to increase amenities." In June 2022, Landlord entered into new leases with several tenants. The leases set lot rent at $400/month, and originally, a fee for trash disposal was included in the lot rent. These leases all contained the same language allowing Landlord to unilaterally increase lot rents after providing the tenant with 60-days' written notice. Specifically, Paragraph 1(c) of the lease agreements states:

> Landlord shall be entitled at any time to increase the monthly rental to an amount determined by Landlord, provided that Landlord gives to Resident written notice thereof by at least sixty (60) days prior to the date on which such increase becomes effective, and provided further that if the Landlord gives such notice, the Resident shall be entitled to terminate this lease by giving written notice of such termination to the Landlord within said period of sixty (60) days.

Further, Paragraph 1(d) of the lease agreements states that "Landlord shall be entitled at any time to modify any other term or condition of this Lease or the included Rules and Regulations provided that Landlord gives to Resident written notice thereof at least sixty (60) days prior to the date on which such modification becomes effective." The lease agreements also contained two provisions regarding trash and utility fees. Paragraph 1(b) provides that "Lot rent does not include electric, water, sewage or trash services." However, Paragraph 10 of the lease states that "[t]rash is included with lot rent."

In September 2022, Landlord sent written notices that it would charge a separate $20 trash utility fee beginning in November 2022.  Then, in November 2022, Landlord sent written notices that it no longer planned to charge the $20 trash utility fee, but that the monthly lot rent would increase from $400 to $550 in February 2023.  The second notice explained that increases in lot rent were necessary to cover new amenities and fund infrastructure repairs that had been deferred by previous owners.  The trash utility fee was also intended to be subsumed in the lot rent increase. The notice provided information about relocating or selling mobile homes as a courtesy to those tenants that chose to terminate their lease and vacate the Park.

Tenants collectively filed suit against Landlord seeking: 1) a declaratory judgment that both the lot rent increase and the trash utility fee were illegal, and 2) an injunction prohibiting Landlord from imposing either charge.  Both parties filed cross-motions for summary judgment, and after a hearing on those motions, the trial court entered judgment in favor of Landlord.  Tenants timely appealed.

## ANALYSIS

### I.  Standard of Review

"We review the trial court's grant of summary judgment de novo."  *VACORP v. Young*, 298 Va. 490, 494 (2020) (citing *Ricketts v. Strange*, 293 Va. 101, 106 (2017)).  "We also review a trial court's construction of statutory provisions de novo.  '[A]n issue of statutory interpretation is a pure question of law which we review de novo.'"  *Id.* (quoting *Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007)).  Issues involving the proper interpretation of a written contract are also reviewed de novo.  *See Christy v. Mercury Cas. Co.*, 283 Va. 542, 546 (2012) (citing *Farmers Ins. Exch. v. Enter. Leasing Co.*, 281 Va. 612, 617 (2011)).

## II. The Rent Increase

Tenants argue that Landlord does not have the authority to "increase the lot rent mid-lease" based on: 1) the terms of the lease itself and 2) the limitations set out in the Manufactured Home Lot Rental Act ("MHLRA").

Tenants first argue that, notwithstanding the fact that the lease purports to grant Landlord the authority to increase the monthly lot rent after giving 60-days' written notice, such a provision "ignores the limitations [Code § 55.1-1301 and -1302] place[] on a landlord's ability to modify the terms of a lease." Specifically, in citing to Code § 55.1-1301, Tenants argue that Landlord must charge a "fixed rent."[1] Here, Tenants point out that the lease at issue "allows an everchanging rent amount during the lease term." Thus, according to Tenants, "the fixed rent [Tenants] initially agreed to is never guaranteed if this provision of the lease is allowed to stand."

Moreover, Tenants argue that "Va. Code § 55.1-1302 requires a landlord to offer a tenant at least a one-year lease[2] but [that the interpretation advanced by Landlord and adopted by the trial

---

[1] Code § 55.1-1301 states, in pertinent part:

> A notice of any change by a landlord in any terms or provisions of the written rental agreement shall constitute a notice to vacate the premises, and such notice shall be given in accordance with the terms of the written rental agreement or as otherwise required by law. The written rental agreement shall not provide that the tenant pay any recurring charges except *fixed rent*, utility charges, or reasonable incidental charges for services or facilities supplied by the landlord.

(Emphasis added).

[2] Code § 55.1-1302(A) states, in pertinent part:

> A landlord shall offer all current and prospective year-round residents a rental agreement with a rental period of not less than one year. Such offer shall contain the same terms and conditions as are offered with shorter term leases, except that rental discounts may be offered by a landlord to residents who enter into a rental agreement for a period of not less than one year.

court] would mean a tenant only has a bi-monthly lease." Tenants posit that "[i]f either party can terminate a lease with [60] days written notice, then there would be no purpose in offering a one-year lease as either party would only be promised [60] days under this erroneous interpretation."

Second, Tenants also argue that the terms of the lease themselves are ambiguous as to whether the lease provisions even grant Landlord the unilateral ability to modify the lot rent mid-term. Tenants point to Paragraphs 1 and 23, contending that these provisions of the lease are contradictory. Paragraph 23 states, in pertinent part, that the lease "contains the entire agreement and shall not be modified, changed, altered, or amended except through the use of a written amendment signed by all [p]arties." While Tenants acknowledge that Paragraph 1(c) expressly grants Landlord the power to increase lot rent after 60-days' written notice, Tenants argue that Paragraph 23 forecloses such action. Given that they contend that these two terms are contradictory and therefore ambiguous, Tenants argue that the contract should be construed against Landlord, the drafter of the contract, to disallow a mid-term lot rent increase. *See Blue Cross of Sw. Va. v. McDevitt & Street Co.*, 234 Va. 191, 195 (1987) ("[A]mbiguous contracts must be construed strictly against the author.").

We address Tenants' second argument first, holding that Paragraphs 1 and 23 of the lease are not contradictory. "Contract language is ambiguous when 'it may be understood in more than one way or when it refers to two or more things at the same time.'" *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 263 Va. 624, 632 (2002) (quoting *Granite State Ins. Co. v. Bottoms*, 243 Va. 228, 234 (1992)). "However, '[a] contract is not ambiguous merely because the parties disagree as to the meaning of the terms used.'" *Id.* (quoting *TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C.*, 263 Va. 116, 119 (2002)).

Contrary to Tenants' contentions regarding Paragraph 23, the language contained therein requiring a bilateral written agreement to modify the terms of the lease does not contradict the

lease's express language granting Landlord the unilateral ability to raise lot rent mid-term, as contained in Paragraph 1(c). These two provisions can be read harmoniously by understanding that Landlord's act of increasing lot rent mid-term was not a modification of the terms of the lease vis-à-vis Paragraph 23, but instead was Landlord's exercise of an *already existing contractual right* contained in Paragraph 1.[3] Therefore, Paragraph 23 does not inject any ambiguity into the contract.

Having determined that Tenants' contention regarding Paragraph 23 is unavailing, we next turn to Tenants' arguments regarding the language of the second opening, unnumbered paragraph, the language of Paragraph 1, and the mandates contained in the MHLRA. Tenants argue that the trial court erred in two respects: 1) determining that the lease agreement actually allowed Landlord to raise lot rents mid-term; and 2) determining that such a provision is consistent with the mandates contained in the two respective statutes.

First, as stated above the lease itself unambiguously reserves the unilateral right to Landlord to raise lot rents mid-term, after giving 60-days' written notice to Tenants. Paragraph 1(c) expressly states that "Landlord shall be entitled *at any time* to increase the monthly rental to an amount

---

[3] In coming to this conclusion, we find precedent from our sister states helpful. In *Johnson Lakes Development v. Central Nebraska Public Power & Irrigation District*, 576 N.W.2d 806 (Neb. 1998), the Nebraska Supreme Court dealt with a remarkably similar issue. There, a commercial lease ostensibly contained two dueling provisions, one allowing the landlord to unilaterally terminate the lease with 60-days' written notice, the other requiring that any modifications to the terms of the lease be accomplished via bilateral written agreement by the two parties. The Nebraska supreme court, in holding that the two provisions did not actually conflict with each other, observed that "the exercise of [the right to terminate] in the manner specified is not a change, modification, abrogation, or annulment of the contract, but, rather, an action contemplated by and taken pursuant to the original agreement of the parties as embodied in their contract." *Id.* at 815. Other states have reached the same conclusion when presented with similar contractual interpretation issues. *See, e.g.*, *Pedigo's Groceries, Inc. v. Mr. M Corp.*, 633 S.W.2d 353 (Tex. App. 1982) (upholding reserved right of either party to terminate 180-month commercial lease by giving 30 days' written notice); *Amoco Oil Co. v. Burns*, 437 A.2d 381 (Pa. 1981) (upholding reserved right of lessor to cancel commercial lease after automatic renewal of term by giving 60-days' written notice); *Preston A. Higgins & Co. v. Stevenson*, 328 N.E.2d 79 (Ill. App. Ct. 1975) (upholding reserved right of parties to commercial lease to terminate before expiration of term by giving 30 days' written notice). We agree with this rationale and deploy the same here, in the instant case.

determined by Landlord, provided that Landlord gives to Resident written notice thereof by at least sixty (60) days prior to the date on which such increase becomes effective." (Emphasis added). Virginia contract law requires a plain reading of a contract where the language is unambiguous. *See Mgmt. Enters., Inc. v. Thorncroft Co., Inc.*, 243 Va. 469, 472 (1992) ("[W]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself . . . . This is so because the writing is the repository of the final agreement of the parties." (alterations in original) (quoting *Berry v. Klinger*, 225 Va. 201, 208 (1983))). Here, the contract clearly reserves the stated unilateral right to Landlord, and this Court is not in the practice of rewriting the terms of private contractual agreements. *See id.* ("[W]e must interpret the agreement as written and we are not free to rewrite its terms." (citing *Graphic Arts Mutual Ins. v. C.W. Warthen Co.*, 240 Va. 457, 460 (1990))).

The more difficult issue is whether the right to unilaterally increase lot rent mid-term, expressly reserved to Landlord in the lease, violates the statutory scheme contained in the MHRLA. In taking up this question, we first find it necessary to explicate the contours of the MHRLA. The MHRLA governs lease agreements between mobile home park landowners and their tenants. Code § 55.1-1301 provides that written rental agreements are required in order to create a mobile home park tenancy.[4] Code § 55.1-1302 contains several mandates and limitations pertaining to these lease

---

[4] This section provides in pertinent part:

> Before the tenancy begins, all parties shall sign and date a written rental agreement that includes all terms governing the rental and occupancy of a manufactured home lot. The landlord shall give the tenant a copy of the signed and dated written rental agreement and a copy of this chapter or a clear and simple description of the obligations of landlords and tenants under this chapter within seven days after the tenant signs the written rental agreement. The written rental agreement shall not contain any provisions contrary to the provisions of this chapter and shall not contain a provision prohibiting the tenant from selling his manufactured home. A notice of any change by a landlord in any terms or provisions of

agreements. First, Code § 55.1-1302 requires landlords to "offer all current and prospective year-round residents a rental agreement with a rental period of not less than one year." Moreover, "[s]uch offer shall contain the same terms and conditions as are offered with shorter term leases." *Id.* From this language, it is clear that a landlord *must* offer prospective tenants a lease term of at least one year. The question then arises: what constitutes a one-year lease? Specifically, as properly teed up by the parties here: can a one-year term lease under Code § 55.1-1302 allow landlord to unilaterally raise the lot rent provision of the lease mid-term and still be a one-year lease? We answer that question in the affirmative.

As stated previously, Code § 55.1-1301 requires that a written lease for mobile home park tenancies contain, among other lease terms, a "fixed rent" to be charged to tenant. Tenants argue that this language binds Landlord to the fixed rent that was set at the outset of the lease term—i.e., $400 per month. Because this increase also simultaneously functions as a "notice to vacate" per Code § 55.1-1301 and the terms of the lease itself, Tenants argue that this increase would effectively cut short the original one-year term that the parties agreed to. We disagree.

As noted above, Code § 55.1-1302 states that a mobile home park landlord *must* offer prospective tenants at least a one-year lease and that in doing so, "[s]uch offer shall contain the same terms and conditions as are offered with shorter term leases." Notably, Code § 55.1-1302 only requires that a landlord "offer" a one-year lease, but it also contemplates the possibility that both parties might agree to a shorter-term lease. Here, the parties agreed that the term of the

---

the written rental agreement shall constitute a notice to vacate the premises, and such notice shall be given in accordance with the terms of the written rental agreement or as otherwise required by law. The written rental agreement shall not provide that the tenant pay any recurring charges except fixed rent, utility charges, or reasonable incidental charges for services or facilities supplied by the landlord.

Code § 55.1-1301(A).

lease would be one year in length, but also agreed that Landlord would retain the right to increase lot rent mid-term and that such an increase would function as a notice to vacate. Thereafter, Tenant would have the choice whether to accept the lot rent increase and remain a tenant, or choose to terminate the lease, per Code § 55.1-1301 and the terms of the lease.

Here, Landlord offered a lease with a one-year duration. The lease gave Tenants the right to terminate the lease in the event Landlord exercised its right to increase the rent, but provision of that option did not itself shorten the term of the lease being offered to less than the stated one-year term. Absent such an election by Tenants, the lease would continue in force until the conclusion of the one-year period that began when the lease took effect. This arrangement comports with the one-year "offer" requirement contained in Code § 55.1-1302. To the extent that Tenants argue that Landlord is bound to charge a "fixed rent" for the entire one-year term of the lease, we agree in part and disagree in part. We agree that, by including language in Code § 55.1-1302 requiring the terms of a one-year lease offer to "contain the same terms and conditions as are offered with shorter term leases," and by including language in Code § 55.1-1301 requiring "fixed rent" to be one of the terms of a lease under the MHRLA, the General Assembly did, in fact, require that landlords under the MHRLA offer a one-year lease to prospective residents with a "fixed rent." However, we disagree that "fixed rent" means what Tenants argue here—i.e., that the rent charged must be $400 per month for all 12 months of the lease. Instead, we understand the term "fixed rent" simply to require some sort of *ascertainable amount*. Black's Law Dictionary defines "fix" as: "To announce . . . [a] price, interest rate, etc. . . . To agree with another to establish a price for goods or services . . . ." *Fix*, *Black's Law Dictionary* (11th ed. 2019). Reading Code § 55.1-1301 in context, this introductory code section of the MHRLA does not purport to require *rent control*, as advanced by Tenants, but is simply a direction from the General Assembly to both parties that, in order to create a binding tenancy

between the two, they must *agree* to a contractual term governing rent. And that contractual term governing rent simply needs to be ascertainable—i.e., the contract must provide a specific formula or method for ascertaining the amount of rent for discrete periods of time, here at minimum 60 days, that will be charged to the tenant. In some rental agreements, the formula may be relatively straightforward—e.g., the monthly rent may be an exact amount that will not change over the duration of the lease term. In other rental agreements, the formula may be more complex, requiring some sort of increase or decrease of the monthly amount, depending on certain factors—e.g., an escalation clause to cover rising operating expenses such as maintenance, utilities, and property taxes, or de-escalation based on the unavailability of certain amenities such as communal playgrounds, etc. Here, the formula agreed to by the parties was that rent would begin at $400 per month, but that Landlord retained the unilateral right to increase the lot rent to a greater amount, so long as Landlord gave Tenants 60-days' written notice. Nothing in this agreement violates the statutory scheme set out in the MHLRA, and we decline to interpret those code sections in a way that would infringe upon the right of Virginians to freely contract with each other. *See Commonwealth v. Va. Ass'n of Cntys. Grp. Self Ins. Risk Pool*, 292 Va. 133, 143 (2016) ("Our common-law tradition counsels that courts 'are not lightly to interfere' with lawful exercises of the 'freedom of contract.'" (quoting *Atlantic Grayhound Lines v. Skinner*, 172 Va. 428, 439 (1939))). In effect, the term "fixed rent" contained in Code § 55.1-1301 does not mean "fixed annual rent," it means "fixed monthly rent."

Therefore, the trial court was correct in ruling that the terms of the lease granting Landlord the ability to unilaterally raise lot rents mid-term were "legal and enforceable."

*III. The Trash Utility Fee*

On appeal, Landlord raised the question of whether this issue pertaining to the trash utility fee has been mooted, based on Landlord's withdrawal of the original trash utility notice. *See Commonwealth v. Browne*, 303 Va. 90, 92 (2024) ("[A] case is moot and must be dismissed when the controversy that existed between litigants has ceased to exist[.]" (alterations in original) (quoting *Daily Press, Inc. v. Commonwealth*, 285 Va. 447, 452 (2013))). At oral argument, counsel for Tenants conceded that the issue pertaining to the trash utility fee was "not properly before the court." Therefore, we do not address the assignment of error pertaining to this issue.

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*